In the Matter of Lois Mildred BARD–PRINZING, Debtor.

Lois Mildred Bard–Prinzing, Plaintiff,

v.

Higher Education Assistance, Foundation, et al., Defendant.

Bankruptcy No. 02 B 12508.
Adversary No. 02 A 00820.

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

June 24, 2004.

Thomas H. Morsch, Esq., for Movant or Plaintiff.

Mark E. Shure, Esq., Keating & Shure, Ltd., Chicago, IL, for Respondent or Defendant.

Joel R. Nathan, Esq., Assistant U.S. Attorney, Chicago, IL, trustee.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

JACK B. SCHMETTERER, Bankruptcy Judge.

This Adversary proceeding was filed by Plaintiff Lois Mildred Bard–Prinzing ("Debtor" or "Plaintiff"). It relates to her case filed under Chapter 7 of the Bankruptcy Code. The Adversary Complaint seeks to have her student loans discharged under 11 U.S.C. § 523(a)(8), contending that they would otherwise impose an "undue hardship" on her.

Defendant Education Credit Management Association, assignee of loans formerly held by USA Funds, Inc. filed an Amended Answer to Plaintiff's Adversary Complaint and defended its student loan claim at trial.

Defendant United States of America, for and on behalf of the U.S. Department of Education and as assignee of a loan formerly held by Texas Guaranteed Student

Loan Corporation, was given leave to intervene, filed an Answer to Plaintiff's Adversary Complaint and defended its student loan claim at trial.

This matter having been tried and the Court having considered the pleadings, the parties' Stipulation of Facts admitted into evidence, the testimony and other evidence presented at trial, and the arguments of counsel, hereby makes and enters the following Findings of Fact and Conclusions of Law:

### FINDINGS OF FACT

1. When Plaintiff filed her Petition in bankruptcy and Adversary Complaint, she was a resident of Chicago, Illinois. On the dates of trial, she was and remains a resident of Vancouver, Washington. She was born on May 9, 1940, and is now 64 years of age. She will attain the age of 65 and then become eligible to receive Social Security on May 9, 2005.

2. Plaintiff graduated from high school in 1958 and was married at age 18. She did not work outside the home during her marriage.

3. Following her marriage, Plaintiff attended Lane Community College and the University of Oregon, which awarded her a Bachelor of Science degree in business administration in December 1976. In order to pay the tuition at Lane Community College, Plaintiff borrowed approximately $990 pursuant to a guaranteed student loan program. The loan was repaid in full by 1982. In order to pay the tuition at the University of Oregon, Plaintiff borrowed approximately $3,600 pursuant to a guaranteed student loan program. She fully repaid that loan by 1982.

4. Plaintiff's marriage ended in 1982, following which Plaintiff actively pursued employment in the Pacific Northwest and at other locations throughout the United States, primarily as a receptionist, secretary or administrative assistant.

5. In 1986, Plaintiff enrolled at Salisbury State University in Maryland in an effort to obtain an advanced degree in English and Teaching in order to qualify to teach on the college level.

6. On May 6, 1986, she executed a promissory note in the principal amount of $5,500 under terms of the federally insured Guaranteed Student Loan Program with a fixed interest rate of 8%, to pay for educational expenses at Salisbury State University. The lender was Educaid and the guarantor was USA Funds, Inc. The promissory note was subsequently assigned to Defendant Educational Credit Management Corporation and is now owned by that Defendant.

7. In 1988, in an effort to obtain an advanced degree in Economics, Plaintiff enrolled at Catholic University in Washington, D.C. In order to pay the tuition, Plaintiff executed a promissory note on January 12, 1988, in the principal amount of $7,500, that was made under terms of the federally insured Guaranteed Student Loan Program. The promissory note accrued interest at the rate of 8% per annum and was due 10 years after Plaintiff ceased to be enrolled as a half-time student at Catholic University. The lender was Student Loan Marketing Association, as assignee of Help–DC, and the guarantor was Texas Guaranteed Student Loan Corporation, as assignee of Higher Education Assistance Foundation. The promissory note was subsequently assigned to the U.S. Department of Education and is now owned by it.

8. On October 11, 1989, Plaintiff returned to Salisbury State University for one semester as a student in the graduate program. In order to pay education expenses related thereto, Plaintiff executed a promissory note in the principal amount of

$3,156, pursuant to the federally insured Guaranteed Student Loan Program. The lender was Educaid and the guarantor was USA Funds, Inc. The promissory note was subsequently assigned to Defendant Educational Credit Management Corporation and is now owned by it.

9. On September 10, 1990, in order to pay educational expenses at George Mason University, Plaintiff executed a promissory note in the principal amount of $4,000, pursuant to terms of the federally insured Guaranteed Student Loan Program with a variable interest rate of 4.2% at the time of trial. The lender was Educaid and the guarantor was USA Funds, Inc. The promissory note was subsequently assigned to Defendant Educational Credit Management Corporation and is now owned by it.

10. In 1991, Plaintiff attended the graduate school at George Mason University with a concentration in international finance. She was enrolled for two semesters.

11. For each phase of her education, Plaintiff borrowed money to pay her tuition in the good faith belief that she would obtain advanced degrees, that she would be able to secure employment that was more remunerative than her then current employment, that she would be able to make provisions for her old age, and that she would be able to repay the loans as they became due as she had done for her student loans at Lane Community College and the University of Oregon.

12. Each of the unpaid loans here at issue was arranged by an office of student aid at each educational institution, and the proceeds of those loans were paid directly to the educational institution and not to Plaintiff. As a result, Plaintiff credibly testified that she never knew the exact amounts of the loans, names of the lenders, or names of the guarantors except to the extent that this information appeared on loan documents signed by Plaintiff, copies of which she does not recall receiving.

13. Plaintiff testified at trial that she made at least two required payments on her guaranteed student loans in 1991, but was unable to recall the amounts paid or identify the lender to which those payments were made. No document or payment record corroborated that testimony. Moreover, the parties' Stipulation of Facts indicates (Paragraph 32) that Plaintiff never made any payments on her student loans. After Plaintiff testified at trial that she made two such payments, Defendant U.S. Department of Education presented evidence to the contrary. Defendant Educational Credit Management Corporation presented no such evidence. However, based on the Stipulation, it is found that she did not make those payments.

14. Notwithstanding her efforts, Plaintiff was unable to obtain advanced degrees from either Salisbury State University, Catholic University, or George Mason University. She therefore continued to work from 1990 to the time of trial as a receptionist, secretary or administrative assistant except for a brief period of time in 1984 when she was employed as a commission-only stockbroker, for periods during the years 1985–1991 when she was employed as a retail sales clerk, and for a few months in 1992 when she was self-employed as a kitchen/bath consultant.

15. In the job as a commission-only stockbroker, her total commissions were only $2,300. In other positions during the years 1992–1995 she was paid $5 to $6 per hour. For a time while she was living in Florida recuperating from a back injury, Plaintiff relied on unemployment compensation.

16. During most of the period after 1988, Plaintiff lived in one-room apartments. In 1988–1989 and again in 1993,

she lived in a rooming house with a bathroom down the hall. For a period of several weeks in 1988 she lived "out of her car" because she could not afford to rent an apartment.

17. In 1995, Plaintiff moved to Chicago in search of more employment opportunities and remunerative employment. From 1995 through 1999, Plaintiff was employed primarily through temporary help agencies.

18. From 1995 until November 2002, Plaintiff resided in a studio apartment at 3600 North Lake Shore Drive, Chicago, Illinois. Her beginning rent was $550 per month, and her rent in November 2002 was $700 per month.

19. In June 1999, Plaintiff obtained a full-time secretarial job with Northwestern University in Chicago, and continued to be so employed until November 2002.

20. In 1999, Plaintiff had an adjusted gross income of $29,737 in total earnings from Northwestern University, Manpower of Indiana, Dobbs Temporary Services, and Watson Dwyer Staffing. In 2000, she received an adjusted gross income of $27,557 in earnings from Northwestern University. In 2001, Plaintiff had an adjusted gross income of $28,022 in earnings from Northwestern University. Her adjusted gross incomes during the years 1999–2001 were prior to deduction of federal and state income taxes, social security and other deductions.

21. In November 2002, Plaintiff relocated from Chicago, Illinois to Vancouver, Washington in order to be closer to her family, in particular her youngest son Jonathan who had been diagnosed with a brain tumor and was then in an advanced stage, and was not expected to survive. In order to move her furniture and other possessions, Plaintiff, then 62 years of age, rented a truck and drove the truck by herself for four days from Chicago to Vancouver, Washington. Plaintiff paid the truck rental by closing out her retirement account at Northwestern University, as a result of which she had no retirement account or other savings on which she could rely when she arrived in Vancouver.

22. Since November 2002 and continuing to the time of trial, Plaintiff was and is employed as an administrative assistant by Standard Insurance Company at its office in Portland, Oregon. Plaintiff's salary at Standard Insurance Company is now $29,900 per annum, or $2,491.66 per month. Her monthly take home pay, after deductions for tax withholding and social security ($577.98), insurance co-pay ($62.34) and credit union savings ($25.00) is $1,826.34. She received some criticisms at work in 2003 that made her apprehend a threat to continued employment, but her Final Performance Appraisal at the end of March, 2004 was positive.

23. In order to travel from Vancouver to Chicago to testify at trial, Plaintiff was required to spend all of the money in her bank account and to use her brother's credit card to rent a hotel room.

24. Plaintiff's average monthly living expenses at the conclusion of trial were as follows:

| | |
|---|---|
| Rent | $ 695.00 |
| Utilities (water and sewer and electricity) | 19.40 |
| Internet and telephone | 40.42 |
| Cable | 15.95 |
| Food | 250.00 |
| Bath and grooming | 45.00 |
| Clothing | 95.00 |
| Laundry and dry cleaning | 27.50 |
| Medical and dental | 225.00 |
| Transportation (not including car payment) | 50.00 |
| Recreation, newspaper | 11.80 |
| Home maintenance (repair and upkeep) | 30.00 |
| Auto insurance | 66.87 |

| | |
|---|---|
| Installment loan on auto | 163.00 |
| Gifts to grandchildren and miscellaneous | 25.00 |
| Emergency savings | 42.90 |
| **Total monthly expense** | **$1,802.84** |

Thus, her monthly expenses are only about $20 less than her monthly net income. She is now in need of extraordinary dental work. After her insurance coverage, she is responsible for the following co-payments:

| | |
|---|---|
| One full gold crown | 225.00 |
| Gold crown on 2nd tooth | 225.00 |
| Root canal on 3rd tooth | 225.00 |
| Crown buildup on 4th tooth | 225.00 |
| Gold Crown on 5th tooth | 225.00 |
| Lower cast frame of partial dentine | 225.00 |
| Porcelain fused to metal crown on 6th tooth | 225.00 |
| Each visit (7 visits @ $10 each) | 70.00 |

The dental clinic thereby requests a total of $1,645 from her in co-payments for the foregoing work, which she lacks and must try to pay in small payments when possible. That is why she budgets $225 per month for dental and medical expenses.

Plaintiff has no income producing property of any kind. Her only other property consists of a used automobile (discussed below), household furnishings, clothing and a bank account and credit union account each with nominal balances for emergencies.

25. Since 1988, Plaintiff has had no dependents except for her need to supply help to her dying son and his family.

26. Plaintiff now travels by commuter bus, and occasionally by her automobile, the ten miles from her Vancouver apartment to her job in Portland, Oregon.

### Inheritance

27. Plaintiff's mother died in 1998. Plaintiff and each of her then living siblings received a distribution from their mother's estate in 1998. Plaintiff's share was approximately $8,700, which she initially deposited in her bank account. Plaintiff spent her $8,700 inheritance over a period of three years on living expenses, professional clothing for her job and periodic payments to her youngest son Jonathan (who was at that time no longer able to work due to his brain tumor) and to Jonathan's wife and minor son (debtor's grandchild) who were in financial need. She did not use any part of it to pay on any student loan. Jonathan died in 2002, after the inheritance had been exhausted.

### Acquisition of Vehicle

28. On January 26, 2003, Plaintiff purchased a used 1988 Chrysler Cirrus for a purchase price of $8,889.60. She financed the auto under an agreement requiring her to make monthly installment payments of $246 for sixty months. The automobile loan agreement and note bear interest at the rate of 21.75% per annum. It would have been paid off in January of 2008. However, she refinanced it with a loan of $8,300 from her credit union, and paid off the original car loan in December of 2003, leaving her with a new 60-month loan of $8,300, payable at 6.2% per annum, with a monthly payment of $163.

29. While Plaintiff did not offer any expert evidence as to current value of the Chrysler Cirrus, she expressed the opinion that the current value of that automobile is substantially less than the value of the loan and that, if she were to sell it, she would be required to pay more to satisfy the loan than she would receive on the sale. Therefore, if she sold it, she would still owe monthly payments of $163 until the balance is paid.

30. Plaintiff purchased the used Chrysler Cirrus in 2003 so that she would be able to travel to the grocery store, dry cleaners and other locations that she could not adequately visit on foot or by public transportation, and so that she would be

able to visit two sons in Northern California.

### Plaintiff's Present Circumstances

31. Plaintiff intends to keep working on a full-time basis until May 9, 2005 when she will be 65 years of age, or possibly to the age of 70 if her health permits her to do so. From the evidence, it is apparent that her monthly income to the date of her retirement will likely remain fairly constant at $30,000 gross per annum except for increases in her income and expenses commensurate with increases in the cost of living. She has attempted though several changes in employment to better her income without success, and she has no skills that would allow her to obtain employment at a higher income. Nor can she put away any significant savings toward her old age.

32. Plaintiff will be entitled to receive $1,063.00 per month in Social Security benefits on May 9, 2010 when she is 70 years of age, a lesser amount on May 9, 2005 when she will be 65 years old. If and when she is no longer able to work, her total income will consist solely of her Social Security benefits plus any interest she is able to earn on her small bank and credit union accounts. She is not currently participating in any retirement or pension plan.

33. In addition to Plaintiff's average monthly expenses, she is also reasonably concerned about future medical bills because she has had breast cancer requiring medical monitoring, and there is a history of high blood pressure and heart disease, and osteoporosis in her family. Under a doctor's care, Plaintiff's high blood pressure has been regulated with medication since January 2000.

34. On the date of filing her Petition in Bankruptcy, Plaintiff's total liabilities were $90,461.20 (including student loan debts totaling $52,010 in issue here). Her assets including the old furniture and auto were valued by her at $3,396.48.

35. As of August 25, 2003, the combined principal balance due and owing to Education Credit Management Corporation under the three promissory notes owned by it was $34,633.75 with interest continuing to accrue at $2.73 per diem. If Plaintiff were to enter into a standard installment repayment plan with Educational Credit Management Corporation, the repayments would be $333.66 a month for a 10-year plan and $241.59 a month for a 15-year plan, at a "weighted" interest rate of 6.87% (which is the weighted average for the three loans owned by that Defendant).

36(a). As of August 22, 2003, Plaintiff owed Defendant U.S. Department of Education $17,377.10 under the Guaranteed Student Loan owned by that Defendant. Plaintiff's only credit was the sum of $50.49, which was recovered from an offset of Plaintiff's federal income tax refund.

(b). The U.S. Department of Education sponsors an Income Contingency Repayment Program through which borrowers may liquidate their federally insured student loans by consolidating one or more of such loans into a single loan and making a single, regular monthly payment calculated on the basis of the borrower's monthly income. Under the Income Contingency Repayment Program, one method of calculating that monthly payment, assuming that Plaintiff's take home pay remains $1,826.34 each month, would require her to pay $180.68 per month toward the liquidation of only the Department of Education loans. Under other programs, monthly payments of $333.66 or $241.75 would be required. If Plaintiff repaid her indebtedness of $17,377.10, owed to the United States' Department of Education under the income contingent repayment

program, Plaintiff's initial monthly install-ment payments would be $124.91.

37. If Plaintiff consolidated and repaid her total indebtedness of $52,010 (owed both to the United States' Department of Education and to the Educational Credit Management Corporation) under the in-come contingent repayment program, Plaintiff's initial monthly installment pay-ments for all those loans would be $348.67. After making three consecutive installment payments of $348.67, Plaintiff could change from the income contingent repayment plan to the graduated repayment plan. Under the graduated repayment plan and with a total consolidated student loan bal-ance of $52,010, Plaintiff's monthly install-ments would then be $256.18 per month. Plaintiff would be entitled to change from another repayment plan to the income con-tingent repayment plan at any time. How-ever, at present she cannot afford the three initial payments of $348.67, or even the subsequent monthly installments of $256.18, without suffering undue hardships consisting of foregoing living necessities and needed dental work.

38. Plaintiff's current income is now barely sufficient to pay her normal living expenses. She could not maintain, based on her current income and expenses, even a minimal standard of living if required to repay the total of $52,010 in guaranteed student loans, even if she were required to make monthly payments of the lowest pos-sible monthly amount of $256.18 under one of the consolidated repayment programs offered by Defendants.

39. Defendants correctly point out the following facts should be weighed in their favor:

- Plaintiff could travel by public trans-portation to work, to shop, and to visit her family members without owning her own automobile (but if she sold that car, she would not pay off her loan on it and would face collection efforts from the finance company).

- Before moving to Vancouver, Wash-ington in November 2002, Plaintiff relied exclusively upon public trans-portation to commute to work and to do her errands.

- A public commuter bus stop is locat-ed within a one block of Plaintiff's apartment in Vancouver, Washing-ton.

- The public express bus that com-mutes from her apartment to her employment, in Portland, Oregon, costs Plaintiff $16.00 each month.

- Plaintiff budgets $163.00 for the monthly auto installment payment, $66.87 for auto insurance, and $50.00 for transportation costs.

- Plaintiff's monthly expenditure of $50.00 for transportation costs is comprised of $9.50 for one day's parking in Portland and $40.50 for gasoline for her automobile.

- Plaintiff's monthly transportation ex-penditure of $50.00 exceeds the cost of a monthly commuter bus pass by $34.00.

- Plaintiff expends $15.95 each month for cable television service that she described as her source of her enter-tainment, and also $40.42 for internet and telephone.

- Plaintiff budgets $42.90 for emergen-cy savings

- Plaintiff budgets $25.00 each month for gifts for her five grandchildren.

- Plaintiff's monthly expenditures to own and operate an auto (car pay-ment: $163; insurance: $66.87; gas: $40.50; parking: $9.50), for cable ($15.95), for phone and internet ($40.42) for emergency savings ($42.90), and for personal grooming

($45.00) total $424.14 and are argued not to be necessary to maintain a minimal standard of living. However, if she sold the car and paid off part of her debt on it, she would still owe the monthly payment of $163. Therefore, her only savings that would result each month from selling the auto (even though vehicle mobility and some use in driving to work is found to be a necessity in her life) would be auto insurance $66.87, and savings of gas and parking which would be offset by increased use of public transportation. Further, her monthly "savings" are really a contingency or emergency fund; that plus the minimal "entertainment" (which includes a small charge for cable and telephone service found here to be a necessity) might raise her monthly available income for loan repayment to $80 or $100 per month, not enough to make minimum monthly payments under one of the consolidated monthly repayment plans that are offered (Finding No. 37).

40. In view of Plaintiff's age, sex, past and current and prospective employment and other circumstances described alone, her present earning capacity is likely to persist indefinitely so long as she is able to work; that is, she will likely continue to earn about $30,000 gross annually plus small annual COLA increases, being without skills to obtain better employment. She will pay off her auto in 2008 (thus saving $163.00 per month), and she will be eligible to draw Social Security payments starting in June of 2005 after she turns 65. In the meantime, however, she can barely make ends meet to pay monthly expenses, and has less earnings than are required both to maintain herself and pay on her student loans without incurring severe and undue hardship that would risk her health

(by foregoing dental work) and safety (by loss of auto mobility and telephone for emergencies).

41. Plaintiff has acted in good faith to obtain more remunerative permanent employment to maximize her income, and to minimize expenses and still meet her obligations to creditors. Payments out of her inheritance were then primarily to enable visits to her dying son and to help support him and his family, and in that circumstance are not found to be in bad faith. Refinance of her loan on the car in 2003 was primarily intended to obtain a lower interest rate and reduce monthly payments.

42. As further evidence of her good faith, Plaintiff could have filed her Petition in Bankruptcy prior to October 7, 1998 when the then current rule for discharge of student loans more than seven years overdue was repealed, but she refrained from doing so until the year 2002.

43. In view of the Findings made here, it would impose an undue hardship on Plaintiff if she were required to make payments under any of the consolidated repayment programs until she becomes entitled to Social Security in 2005, but she may then be able to qualify and pay under one of the consolidated plans offered for repayment of student loans.

44. Additional facts set forth in the Conclusions of Law will stand as additional Findings of Fact.

### CONCLUSIONS OF LAW

1. The Court has jurisdiction of the subject matter and of the parties to these proceedings.

2. Guaranteed student loans may be discharged in bankruptcy only if they would impose an "undue hardship" on the

debtor if such loans were not discharged. 11 U.S.C. § 523(a)(8).

■ 3. Eight circuits including the Seventh Circuit have adopted the same standard for undue hardship. *See Norton Bankruptcy Law Advisor,* (April 2004, at pp. 4–5). Undue hardship requires a three-part showing by the debtor (1) that the debtor cannot maintain, based on current income and expenses, a minimal standard of living if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans. *Matter of Roberson,* 999 F.2d 1132, 1135 (7th Cir.1993), quoting *Brunner v. New York State Higher Education Services Corp.,* 831 F.2d 395, 396 (2d Cir.1987) (per curiam). For reasons set forth below, Debtor has established the first and third requirements, but not the second.

■ 4. Undue hardship encompasses a notion that the debtor may not willfully or negligently cause her own default, but rather that her condition has result from factors beyond her reasonable control. *Matter of Roberson,* 999 F.2d 1132, 1136 (7th Cir.1993).

■ 5. The Debtor's good faith efforts to repay her guaranteed student loans are measured by her efforts to obtain employment, maximize income and minimize expenses. *Matter of Roberson,* 999 F.2d 1132, 1136 (7th Cir.1993).

■ 6. A lack of payment does not by itself necessarily preclude a good faith finding. *Great Lakes Higher Education Corp. v. Brown (In re Brown),* 239 B.R. 204 (S.D.Cal.1999); *Clevenger v. Nebraska Student Loan Program (In re Clevenger),* 212 B.R. 139 (Bankr.W.D.Mo.1997).

7. If the Debtor in this case had sought discharge of her student loan obligations prior to the amendment of 11 U.S.C. § 523(a)(8) on October 7, 1998, she would have been entitled, as a matter of law, to a discharge of such obligations under the seven-year test then in effect.

## *Alternative Payment Plans*

8. Despite a borrower's default under a Guaranteed Student Loan, that borrower can participate in the Income Contingent Repayment Program by simply consolidating as many of their eligible student loans as desired into a direct consolidation student loan. 34 C.F.R. §§ 685.220(b)(2) and 685.220(h)(2).

9. A borrower of a defaulted Guaranteed Student Loan (now known as Federal Family Education Loan is eligible to consolidate such a student loan into a direct consolidation student loan). 34 C.F.R. §§ 685.200(c).

10. Under the direct Consolidated Student Loan Program, to consolidate a Guaranteed Student Loan into a direct student loan, a borrower must agree to repay the direct consolidated loan under the income contingent repayment plan. 34 C.F.R. § 685.200(c).

11. Under the income contingent repayment plan, a borrower is entitled to repay their direct consolidated student loans under the lesser of two repayment calculations. 34 C.F.R. § 685.209(a)(2).

12. If a borrower is required to repay a default loan under the income contingent repayment plan, then that borrower may not change to another repayment plan until the borrower makes three consecutive monthly payments under the income contingent repayment plans. 34 C.F.R. 685.210(b)(2).

13. A borrower may change from another of the three different repayment plans to the income contingent repayment

plan at any time. 34 C.F.R. § 685.210(b)(1).

14. If a borrower's earnings combined with one-half of a borrower's Social Security benefits does not exceed $25,000, then no part of Plaintiff's Social Security benefits are included in her adjusted gross income. 26 U.S.C. § 86(a); *Laws v. Commissioner of Internal Revenue*, No. 13979–99, 2003 WL 158697 (U.S.Tax Ct., Jan.22, 2003).

■ 15. To meet the "good faith" test, Debtor must take advantage of one of the repayment plans available to her if and when she is able to do so. *Dept. Ed. v. Wallace*, 259 B.R. 170, 182 (C.D.Cal., 2000); *Thoms v. Ed. Credit Mgt.*, 257 B.R. 144 (Bankr.S.D.N.Y., 2001).

### Limits of Court Authority

16. As an alternative to finding such loans to be dischargeable in their entirety, it has sometimes been held that they are dischargeable in part, *In re Brown*, 239 B.R. 204 (S.D.Cal.1999); 144 F.3d 433 (6th Cir.1998), or that some such loans are dischargeable while others are not. *Hollister v. University of N. Dakota (In re Hollister)*, 247 B.R. 485 (Bankr.W.D.Okla. 2000) (citing *Andresen v. Nebraska Student Loan Program (In re Andresen)*, 232 B.R. 127 (8th Cir. BAP 1999)). However, under the Seventh Circuit ruling in *Roberson*, such alternatives are not likely possible in this Circuit.

17. A bankruptcy judge may find that some of the debtor's monthly expenses are necessary for the debtor to maintain a minimal standard of living, and that others are not. *In re Hollister*, 247 B.R. 485 (Bankr.W.D.Okla.2000); *In re Brown*, 239 B.R. 204 (S.D.Cal.1999) (finding that visitation expenses in connection with debtor's son in another state were necessary expenses). The expenses that she pays out each month are necessary expenses; her

discretionary income is no more than small sums necessary for emergencies.

■ 18. The trial judge may defer ruling until the debtor's financial situation has settled, *Matter of Roberson*, 999 F.2d 1132 (7th Cir.1993) (two-year deferral of ruling left standing by Court of Appeals), or may stay entry of judgment on the debtor's Adversary Complaint to see whether the undue hardship remains. *Cheesman v. Tenn. Student Assistance Corp. (In re Cheesman)*, 25 F.3d 356 (6th Cir.1994) (18–month stay of judgment upheld).

■ 19. A bankruptcy judge's equitable power under 11 U.S.C. § 105(a) does not allow granting of any discharge if the "undue hardship" burden of § 523(a)(8) is not met, because 11 U.S.C. § 105(a) powers can only be used consistently with the more specific statutory language of 11 U.S.C. § 523(a)(8). *Hemar Ins. Corp. of America v. Cox (In re Cox)*, 338 F.3d 1238 (11th Cir.2003).

■ 20. The grant of authority under § 105(a) "must be exercised within the confines of the bankruptcy code." *Gouveia v. Tazbir*, 37 F.3d 295 (7th Cir.1994); *In re Fesco Plastics Corp.*, 996 F.2d 152, 154 (7th Cir.1993); *see also Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988).

21. Government does not guarantee a student's future financial success. If the investment by the student as borrower in an education does not generate the return the borrower anticipated, the student, not the taxpayers, must accept the consequences of the decision to borrow. *Matter of Roberson*, 999 F.2d 1132, 1137 (7th Cir. 1993).

### Application of Facts here to Standards

■ 22. Plaintiff has acted in good faith effort to obtain and better her em-

ployment so as to achieve ability to repay her loans (Finding Nos. 41, 42) and in repaying two early education loans (Finding No. 3). If forced to repay the remaining loans now, she cannot maintain a minimal standard of living and cannot have necessary dental work performed. This condition is likely to persist through June of 2005 after which she can collect Social Security. Her ability to pay at that time can be foreseen unless she suffers some setback in health, employment or otherwise.

23. It would, however, impose an undue hardship on Plaintiff, within the meaning of 11 U.S.C. § 523(a)(8), if she were presently required to pay anything on any of the guaranteed student loans here at issue. That condition will prevail until she becomes entitled to Social Security in June of 2005. At that time, it may not be an undue hardship for her to arrange payments under one of the offered payment programs provided she not suffer any new employment or health problems. While her future cannot be predicted with certainty, there is a possibility that she will be able to make payments on her loans after she becomes eligible for Social Security and if she is then able to continue in employment. Therefore, she does not presently meet the required showing of "likely to persist" (Conclusion No. 3) for statutory "undue hardship."

### CONCLUSION

Judgment will therefore enter in favor of Defendants denying discharge of the student loans in issue here, but staying the effective date of the judgment until June 30, 2005. In the judgment, the Court will until that date reserve jurisdiction to reopen the case and judgment and review the facts under the "likely to persist" standard should she suffer any new material financial difficulties due to health, employ-

ment, or otherwise, and to review whether she remains in good faith by considering her ability and willingness to apply for one of the repayment plans available.