**In re Douglas A. WALLACE, Jr., Debtor.**

**Douglas A. Wallace, Jr., Plaintiff,**

v.

**Educational Credit Management Corporation, Defendant.**

Bankruptcy No. 06–55479.
Adversary No. 06–2735.

United States Bankruptcy Court,
S.D. Ohio,
Eastern Division,
at Columbus.

Dec. 1, 2010.

Matthew J. Thompson, Nobile & Thompson Co., L.P.A., Hilliard, OH, for Plaintiff.

James H. Gordon, Columbus, OH, William M. Harter, Frost Brown Todd PLLC, Columbus, OH, for Defendant.

### *MEMORANDUM OPINION AND ORDER ON COMPLAINT SEEKING DISCHARGEABILITY OF PLAINTIFF'S STUDENT–LOAN DEBT*

C. KATHRYN PRESTON, Bankruptcy Judge.

## I. Introduction

This cause came on for trial on August 30, 2010 on the Amended Complaint (Doc. 41) of Plaintiff–Debtor Douglas A. Wallace, Jr. ("Wallace" or "Debtor") seeking a determination that the payment of his student-loan debt would impose an undue hardship on him and that the debt, therefore, is dischargeable under 11 U.S.C. § 523(a)(8). Present at the trial were Wallace and his attorney, Matthew J. Thompson, as well as William M. Harter, attorney for Defendant Educational Credit Management Corporation ("ECMC"). The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the General Order of Reference entered in

this District. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

For the reasons stated below, the Court finds that Wallace has not established the undue hardship that would allow the Court to declare his student-loan debt to be dischargeable under § 523(a)(8) of the Bankruptcy Code. In an exercise of its equitable authority under § 105(a), however, the Court will stay its judgment to that effect pending a status conference to be held at 2:00 p.m. on September 5, 2012. In the meantime, until the Court orders otherwise: (a) Wallace shall make payments to ECMC of $20 per month on the first day of each month, commencing January 1, 2011; and (b) ECMC shall undertake no efforts to collect any amount from Wallace in excess of $20 per month.

## II. Findings of Fact

The Court makes the findings of fact set forth below based on: (a) the stipulations of the parties; and (b) the evidence adduced at trial, including the exhibits admitted into evidence and the testimony elicited from the witnesses.

Wallace was diagnosed with diabetes when he was nine years of age. Nevertheless, he enjoyed the typical range of educational and extracurricular activities through high school. After receiving his high-school degree, Wallace attended classes at Wittenberg University and Columbus State Community College and obtained a bachelor's degree in sociology from Eastern Kentucky University. To fund his post-secondary education, Wallace: (a) held part-time jobs, including positions at various restaurants and on the assembly line at American Honda Motor Co., Inc. ("Honda"); and (b) received a consolidated educational loan ("Loan") in the amount of $32,541.13 in December 2004. After receiving his college degree, Wallace began to work as a manager of information technology at Kelly Services in 2005. He held that position for approximately one year, earning $12,261, but left after developing vision problems as a result of his diabetes. Also, as a result of the diabetes, Wallace underwent dialysis and multiple surgeries from 2005 to 2006. He developed kidney disease and, in April 2008, received pancreas and kidney transplants. Now 31 years old, Wallace is considered legally blind, with a prosthetic implant in his right eye socket and apparently uncorrectable 20/400 vision in his left eye. Whatever vision Wallace has is extremely limited. During his testimony, Wallace attempted to read written materials presented to him. Even while holding the materials near his face, he was unable to make out words written in typeface and was able to read only certain words that he or a family member had written using large handwriting. Because of his visual impairment, Wallace will never again be able to qualify for a driver's license. Sometime in 2006, the Social Security Administration determined that Wallace was permanently disabled due to his blindness.

Wallace has not been employed since leaving Kelly Services and apparently has made no efforts to obtain employment since that time. He had a series of contacts with the Ohio Rehabilitation Services Commission's Bureau of Services for the Visually Impaired ("BSVI") beginning in April 2006. According to Wallace, BSVI suggested various alternatives to him, including education or training at the Ohio State School for the Blind in Columbus, Ohio. Wallace believes that he could not attend the school or avail himself of the other alternatives suggested by the BSVI due to transportation issues he faces as a result of his visual impairment and the location of his residence. Due to his health issues and limited earning capacity, Wallace lives with father and sister in Plain City, Ohio, a rural village located several miles from Columbus. Wallace's

father, who works full-time at a Honda plant in Marysville, Ohio, and his sister, who is a student, apparently cannot provide him transportation because of their work and school schedules. There is no public transportation from Plain City to Columbus available to Wallace.

On September 29, 2006 ("Petition Date"), Wallace filed his voluntary Petition for Relief under Chapter 7 of the Bankruptcy Code. On the same day he commenced his bankruptcy case, Wallace filed his schedules of assets and liabilities. He owns no real property. He listed minimal personal property on Schedule B—a checking account with a balance of $253.41 and clothing with a value of $100—all of which he claimed as exempt. On his Schedule I, Wallace listed Social Security Disability ("SSD") as his only source of income, in the amount of $725 per month. Due to cost-of-living adjustments, his SSD benefits have increased to $811 per month; this remains his only source of income. Wallace has no dependents.

The evidence regarding Wallace's current expenses was presented in a somewhat disjointed fashion. Although some of these figures are likely rough estimates, it appears that Wallace currently has the following average monthly expenses:

| | |
|---|---|
| Rent paid to father: | $300 [1] |
| Electric: | $ 50 |
| Water: | $ 30 |
| Food (at home): | $100 |
| Food (eating out): | $100 [2] |
| Clothing: | $100 |
| Cell phone: | $ 50 |
| Prescriptions: | $ 50 |

These expenses aggregate $780.[3] Wallace, however, did not include any amounts for items such as laundry or personal hygiene. Adding $10 per month to his monthly expenses for those items and comparing the resulting total of $790 in monthly expenses to Wallace's monthly income ($811) leaves Wallace with a surplus of approximately $20 per month.

Wallace has made no payments on the Loan since its inception. The interest rate on the Loan is fixed at 2.875% per annum, causing interest to accumulate on the Loan at the rate of $2.73 per diem. The balance due on the Loan as of August 1, 2010 is $38,028.83. Wallace never applied for a Total and Permanent Disability ("TPD") discharge of the amount owed under the

---

1. The total rent for the residence where Wallace and his father reside is $800 per month. Wallace's 23-year old sister also lives at the residence, but she is a student and apparently does not contribute to the rent.

2. Although Wallace testified that he occasionally pays for meals at restaurants for persons other than himself, there is no evidence that his doing so regularly contributes in a significant way to his monthly expenses.

3. In his response to ECMC's interrogatories, Wallace listed expenses of $486 per month (made up of $186 for a Medicaid spenddown, $200 for food and $100 for utilities). Under the case law discussed below, these expenses are clearly inadequate to support a minimal standard of living. On Schedule J of his schedules of assets and liabilities, Wallace made what would appear to be a more reasonable estimate of his average monthly expenses: $100 for utilities, $300 for food, $50 for clothing, $175 for a "Medicare spenddown" and $100 for transportation. Although the categories differ from those mentioned at trial, the amount of the expenses—$725—is only slightly less than the $780 aggregate amount of expenses to which Wallace testified. It is not surprising that Wallace's expenses would have increased from the time he completed the schedules in September 2006 to the time of the trial nearly four years later in August 2010. In addition, his testimony regarding (a) his medical-related travel in 2006, which would largely be unnecessary now that his medical condition has stabilized, (b) the requirement of a Medicare spenddown, which apparently has ended; and (c) the fact that he began paying his father rent sometime in 2006 (possibly after the Petition Date) would appear to explain why the categories of expenses at the time of filing differ from those he had at the time of trial.

Loan, nor did Wallace seek to repay the Loan through the Income Contingent Repayment Plan ("ICRP") or the Income–Based Repayment Plan.

### III. Conclusions of Law

#### A. Discharge of Student–Loan Debt

On February 2, 2007, the Court entered an order granting Wallace a discharge of most of his debts. Section 523(a)(8) of the Bankruptcy Code, however, states as follows:

(a) A discharge ... does not discharge an individual debtor from any debt—

. . . .

*unless excepting such debt from discharge under this paragraph would impose an undue hardship on the debtor* and the debtor's dependents, for—

(A)(i) an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution; or

(ii) an obligation to repay funds received as an educational benefit, scholarship, or stipend; or

(B) any other educational loan that is a qualified education loan, as defined in section 221(d)(1) of the Internal Revenue Code of 1986, incurred by a debtor who is an individual[.]

11 U.S.C. § 523(a)(8) (emphasis added).

■■■ Thus, Wallace's student-loan debt is dischargeable only if he can prove that its repayment would impose an undue hardship on him. *See Barrett v. Educ. Credit Mgmt. Corp. (In re Barrett)*, 487 F.3d 353, 359 (6th Cir.2007). In order to establish undue hardship under Sixth Circuit law, a debtor must demonstrate the following:

(1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for [himself] and [his] dependents if forced to

repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.

*Barrett*, 487 F.3d at 359 (quoting *Oyler v. Educ. Credit Mgmt. Corp. (In re Oyler)*, 397 F.3d 382, 385 (6th Cir.2005)) (quoting *Brunner v. New York State Higher Educ. Servs. Corp.*, 831 F.2d 395, 396 (2d Cir. 1987)). As have other courts, the Sixth Circuit Court of Appeals derived this formulation from *Brunner*, and the test therefore is often referred to as the "*Brunner* test."

■■■ Wallace has the burden of proving each of the three prongs of undue hardship under the *Brunner* test by a preponderance of the evidence. *See Barrett*, 487 F.3d at 359. ECMC contends that he has failed to carry his burden under each of the three prongs.

##### 1. The Minimal–Standard–of–Living Prong of the *Brunner* Test

■■■ "The essence of the minimal standard of living requirement 'is that a debtor, after providing for his or her basic needs, may not allocate any of his or her financial resources to the detriment of ... student loan creditor(s).'" *Grove v. Educ. Credit Mgmt. Corp. (In re Grove)*, 323 B.R. 216, 223 (Bankr.N.D.Ohio 2005) (quoting *Mitcham v. U.S. Dep't of Educ. (In re Mitcham)*, 293 B.R. 138, 144 (Bankr.N.D.Ohio 2003)) (citing *Rice v. United States (In re Rice)*, 78 F.3d 1144, 1149 (6th Cir.1996)).

Several courts have defined the phrase "minimal standard of living" more specifically as follows:

This Court believes that a minimal standard of living in modern American society includes these elements:

1. People need shelter, shelter that must be furnished, maintained, kept clean, and free of pests. In most climates it also must be heated and cooled.

2. People need basic utilities such as electricity, water, and natural gas. People need to operate electrical lights, to cook, and to refrigerate. People need water for drinking, bathing, washing, cooking, and sewer. They need telephones to communicate.

3. People need food and personal hygiene products. They need decent clothing and footwear and the ability to clean those items when those items are dirty. They need the ability to replace them when they are worn.

4. People need vehicles to go to work, to go to stores, and to go to doctors. They must have insurance for and the ability to buy tags for those vehicles. They must pay for gasoline. They must have the ability to pay for routine maintenance such as oil changes and tire replacements and they must be able to pay for unexpected repairs.

5. People must have health insurance or have the ability to pay for medical and dental expenses when they arise. People must have at least small amounts of life insurance or other financial savings for burials and other final expenses.

6. People must have the ability to pay for some small diversion or source of recreation, even if it is just watching television or keeping a pet.

*Ivory v. United States (In re Ivory)*, 269 B.R. 890, 899 (Bankr.N.D.Ala.2001); *see also Myers v. Fifth Third Bank (In re Myers)*, 280 B.R. 416, 421–22 (Bankr. S.D.Ohio 2002) (applying the *Ivory* factors in determining what constituted a minimal standard of living); *Zook v. Edfinancial Corp. (In re Zook)*, 2009 WL 512436 at *6 (Bankr.D.D.C. Feb.27, 2009) (same).

 The monthly expenses enumerated by Wallace at trial would not quite support a minimal standard of living under *Ivory*. For example, Wallace did not include any amounts for laundry and personal hygiene. The Court may include such omitted items in its calculation of whether or not the Debtor meets the first prong. *See Zook*, 2009 WL 512436 at *6. At trial, ECMC questioned Wallace's payment of $300 of rent to his father. The rent, however, is a reasonable expense under the circumstances. *See Cline v. Ill. Student Loan Assistance Assoc. (In re Cline)*, 248 B.R. 347, 350 (8th Cir. BAP 2000) ("Cline lives very modestly. She rents a unit in a duplex from her father for $465 per month and her other expenses are minimal."); *Roach v. United Student Aid Fund, Inc. (In re Roach)*, 288 B.R. 437, 444 (Bankr. E.D.La.2003) ("Ms. Roach has reduced her expenses to a bare minimum. She lives in an apartment she rents from her father....").

ECMC also suggests that Wallace is allocating his financial resources to its detriment. ECMC contends that Wallace's expenses are "discretionary" and that Wallace could allocate his SSD income to make payments on the Loan because the income of Wallace's father is "significantly more than enough to allow [the father] and [the Debtor] to have a comfortable lifestyle." *See* Trial Brief of Educational Credit Management Corporation ("ECMC Trial Brief") (Doc. # 51) at 4. The Court rejects this argument under the facts of this case. Although there was some evidence of the father's income, there was no evidence of his expenses, other than the monthly rent for the residence. Nor was there any evidence that Wallace's father regularly contributes significantly to Wallace's living expenses (other than the fact that Wallace's rent is lower than it might otherwise be if Wallace were not able to live with his father). Moreover, ECMC has pointed to no case law holding that a debtor cannot satisfy the minimal-stan-

dard-of-living prong if the debtor has a parent who could, if he or she chose, contribute to the debtor's expenses and thereby lift the debtor above a minimal standard of living, or holding that a parent of an adult has an obligation to do so.

■ Taking all factors into consideration and as illustrated in Section II above, the Court finds that Wallace has met the minimal-standard-of-living prong of the *Brunner* test with respect to any amount due or accruing on the Loan in excess of $20 per month.[4]

### 2. The Additional–Circumstances Prong of the *Brunner* Test

■ Under the second prong, Wallace "must show that circumstances indicate a certainty of hopelessness, not merely a present inability to fulfill financial commitment." *Barrett,* 487 F.3d at 359 (internal quotation marks omitted).[5] Such circumstances "may include, but are not limited to, illness, disability, a lack of useable job skills, or the existence of a large number of dependents," but "[u]ltimately, the most important factor in satisfying the second prong is that the additional circumstances must be beyond the debtor's control, not borne of free choice." *Id.* (citations and internal quotation marks omitted). Although Wallace's blindness is a disability and ECMC concedes that it was beyond his control, ECMC questions whether his continued unemployment is a result of uncontrollable factors. In addi-

tion, ECMC took the position during trial that Wallace could make payments on the Loan if only he were employed. Indeed, to satisfy the second prong, Wallace is "obliged to seek work that would allow debt repayment before he can claim undue hardship"[6] or illustrate why he cannot do so. At one time, Wallace aspired to work as a law-enforcement officer or as a criminologist. If he is unable to work in his chosen field, however, he must seek employment in another field. *See Tirch v. Penn. Higher Educ. Assistance Agency (In re Tirch),* 409 F.3d 677, 681 (6th Cir. 2005). Wallace has yet to do so.

In *Whitener v. United States (In re Whitener),* 2008 WL 207550 (Bankr.S.D.Ill. Jan.24, 2008), the bankruptcy court addressed the "additional circumstances" prong in the specific context of blindness. The debtor in that case, like Wallace: (1) had some very limited vision, but could not operate a motor vehicle; (2) although unemployed, had held various jobs throughout his adult life; (3) had SSD as his only source of income; (4) resided with a family member so that his living expenses were lower than they otherwise would have been; (5) had some minimal monthly surplus income; and (6) had produced no evidence that he was incapable of holding any job in the future. *Whitener,* 2008 WL 207550 at *1. Given the evidence, the *Whitener* court held that the debtor failed to satisfy the second prong of the *Brunner* test because he had not established that

---

**4.** Although a bankruptcy court may grant a partial discharge of student-loan debt, *see Miller v. Penn. Higher Educ. Assistance Agency (In re Miller),* 377 F.3d 616, 624 (6th Cir. 2004), the debtor must satisfy each prong of the *Brunner* test with respect to the portion to be discharged. The Court, therefore, cannot order a partial discharge (of amounts in excess of $20 per month) at this time because, as explained below, Wallace has not satisfied the second prong of the *Brunner* test.

**5.** "Hopelessness" is not a factor in and of itself. In connection with the statement in *Barrett* regarding a "certainty of hopelessness," the Sixth Circuit Court of Appeals has noted, with apparent approval, that "[c]ourts universally require more than temporary financial adversity and typically stop short of utter hopelessness." *Tenn. Student Assistance Corp. v. Hornsby (In re Hornsby),* 144 F.3d 433, 437 (6th Cir.1998).

**6.** *Oyler,* 397 F.3d at 386.

his unemployed status was likely to persist. *Whitener*, 2008 WL 207550 at \*2.

■■■ At trial in the instant case, Janet Kilbane, MEd., CRC, a case manager with VocWorks, testified on behalf of ECMC. She observed that blindness does not inevitably lead to an inability to find work and that new technologies have provided visually-impaired persons with the additional training that they sometimes need in order to find suitable work. She testified that she believed that Wallace would be eligible to be evaluated for participation in BSVI programs, but could not state whether Wallace would be successful in obtaining employment if he attempted to do so. A court, however, "may take judicial notice of the effect that a debtor's well-known medical condition may have on the debtor's ability to earn a living." *Hertzel v. Educ. Credit Mgmt. Corp. (In re Hertzel)*, 329 B.R. 221, 232 (6th Cir. BAP 2005). Thus, the Court can take judicial notice that blind people are employed in a variety of settings. *See Larson v. United States (In re Larson)*, 426 B.R. 782, 788 (Bankr.N.D.Ill.2010) ("[The debtor, who is blind] works at Nicor gas as a customer service representative, monitoring sales calls. He has worked there since 1999, and is able to use specialized computer software to overcome his blindness. He has a guide dog, and commutes by public bus or by taxi when the bus is not running. . . ."); *Reed v. SLM Corp. (In re Reed)*, 2005 WL 1398479 at \* 4 (Bankr. D.Vt. June 13, 2005) (visually-impaired debtor was employed as a greeter at Wal–Mart). On the other hand, the Court also can take judicial notice that being blind significantly increases the difficulty of obtaining employment and that there are blind people who are unable to find work. *See Wilkinson–Bell v. Educ. Credit Mgmt. Corp. (In re Wilkinson–Bell)*, 2007 WL 1021969 at \*3 (Bankr.C.D.Ill. Apr. 2, 2007) ("The Debtor easily meets [the second prong of the *Brunner* test]. The Debtor is permanently blind. This disability, along with her other physical afflictions, prevent her from obtaining employment.").

■■■ As to Wallace's future prospects, it bears noting that he is intelligent and has a bachelor's degree in sociology. In addition, he is now a few years removed from having undergone multiple surgeries, and his physical condition appears to have stabilized. On the other hand, there is no doubt that he faces significant obstacles resulting from his blindness. It remains to be seen into which group Wallace will land, whether he will find work or remain unemployed.

If Wallace were to obtain employment, the Court also would need to consider (a) whether his monthly expenses had increased as a result of his employment and (b) if so, whether those increased expenses would affect his ability to pay going forward. Wallace testified that he is unable to live alone due to his visual impairment and that he therefore lives with his father in Plain City, Ohio. Plain City is a small rural village near the Honda automotive plant where his father works. Wallace once worked on the assembly line at Honda, but returning to that position and commuting with his father to work would not be an option at this point in his life given his visual impairment. If Wallace were able to find work, it would almost certainly require him to obtain transportation services. Janet Kilbane testified that certain programs with which she is familiar help visually-impaired individuals utilize local transportation services. She also testified, however, that she is unfamiliar with the transportation services, if any, in Plain City and that the assisted individuals are required to contribute toward the costs of their transportation. Wallace did not include any amount for transportation in his calculation of monthly expenses presented at trial. Therefore, employment likely

would result in a significant increase in Wallace's monthly expenses on account of transportation. Employment also might increase other monthly expenses, such as expenses for food and clothing, and possibly for living arrangements.

In light of the foregoing, the Court concludes that Wallace has not yet satisfied the second prong of the *Brunner* test. The Court, however, is not prepared to enter a judgment holding the Loan nondischargeable and will exercise its equitable authority described in Part III.B below.

### 3. The Good–Faith–Effort–to–Repay Prong of the *Brunner* Test

ECMC questions Wallace's good faith efforts to repay the Loan on three grounds: (a) Wallace's failure to maximize his income by seeking employment; (b) his failure to make any payments on the Loan; and (c) his failure to participate in the ICRP or apply for TPD. Regarding Wallace's alleged failure to maximize his income, as explained in Part III.B below, the Court will provide Wallace with an additional period of time in which to explore whether he can become employed.

▇▇ In analyzing whether a debtor has made good faith efforts to repay, "the court should examine [1] the debtor's previous efforts to repay ... including the debtor's financial situation over the course of time when payments were due; [2] the debtor's voluntary undertaking of additional financial burdens despite his knowledge of his outstanding [student-loan] debt; and [3] the percentage of the debtor's total indebtedness represented by student loans." *Rice,* 78 F.3d at 1150.[7]

▇▇ The first two *Rice* factors demonstrate that Wallace has satisfied the good-faith prong despite not having made

any payments on the Loan to date. There is no evidence that Wallace voluntarily undertook additional financial burdens to the detriment of ECMC. In addition, "[m]ere failure to make a minimal payment does not prevent a finding of good faith where a debtor has never had the resources to make a payment." *Speer v. Educ. Credit Mgmt. Corp. (In re Speer),* 272 B.R. 186, 197 (Bankr.W.D.Tex.2001). Until recently, Wallace's financial condition during the repayment period would not have permitted him to make any payments on the student-loan debt. The year following graduation from college, Wallace earned only $12,261 while working at Kelly Services. Because he was working, still driving and possibly not living with his father, his expenses would have been higher during that year, making it unlikely that he could have made payments on his student loan. After that, Wallace was dealing with factors beyond his control—including organ failure, multiple surgeries and ultimately loss of his sight—that would have affected his efforts to repay the loan. *See Cekic–Torres v. Access Group, Inc. (In re Cekic–Torres),* 431 B.R. 785, 795 (Bankr.N.D.Ohio 2010) (noting ameliorating factors in finding that debtor satisfied the good faith prong of the *Brunner* test despite not having made any payments on the student-loan debt). As reflected on his schedules, Wallace's assets as of the Petition Date were minimal, including clothing and a small amount of cash in a checking account; quite simply, he has nothing he could liquidate in order to make payments on the Loan. Wallace's inability to pay is further evidenced by the fact that, in its own trial brief, ECMC stated that it had calculated that Wallace could qualify for a $0 per month repayment plan if he chose to participate in the ICRP. *See* ECMC Trial Brief at 6.

---

7. Although *Rice* addressed the discharge of Health Education Assistance Loans, the Sixth Circuit Court of Appeals has held that "[t]he

factors noted in *Rice* are also relevant in evaluating discharge of ordinary student loans." *Hornsby,* 144 F.3d at 437 n. 7.

Moreover, the Sixth Circuit Court of Appeals has held that, although "probative of [an] intent to repay [the] loans," a debtor's decision to forgo "participation in the ICRP," "is not a per se indication of a lack of good faith[.]" *Barrett*, 487 F.3d at 364. At some time prior to trial, Wallace's counsel advised him of possible negative tax implications of participating in the ICRP, that forgiveness of debt may be treated as taxable income by the Internal Revenue Service. Although ECMC disputes that Wallace's participation in the ICRP would result in negative tax consequences for him, this does not change the fact that Wallace apparently declined to participate in the ICRP based at least in part on his counsel's advice regarding the tax consequences of participating. In addition, courts have held that failure to participate in the ICRP does not evidence a lack of good faith if the debtor had "an inability to afford any payment toward [his] student loans at the time the offer of the ICRP was made." *Douglas v. Educ. Credit Mgmt. Corp. (In re Douglas)*, 366 B.R. 241, 262 (Bankr.M.D.Ga.2007). As explained above, it appears to have been the case during much of the repayment period that Wallace had no ability to make any payments on his student loan. The Court, therefore, concludes that Wallace's declining to participate in the ICRP does not evidence bad faith. Likewise, given that Wallace had already been declared permanently disabled for purposes of receiving SSD, the Court is not persuaded by ECMC's argument that Wallace exhibited bad faith by failing to undergo another process, the TPD, for being declared disabled.

■ In assessing the third factor set forth in *Rice*—the percentage of the debtor's total indebtedness represented by the student loans—the Court must examine whether the amount of the student-loan debt compared to the amount of the debtor's total indebtedness would suggest that the discharge of the student-loan debt was the motivating factor in the debtor's filing for bankruptcy. *See Rice*, 78 F.3d at 1151. In *Rice*, the debtor's "student loans comprised 78 percent of his total indebtedness" and, when combined with the student-loan debt of the debtor's spouse (which debt was not at issue), "96 percent of the debts to be discharged on their joint petition were student loans." *Id.* at 1147 & n. 2. The Sixth Circuit Court of Appeals found that the student loans "comprised the bulk of Rice's indebtedness" and that this "strongly suggests that their discharge was the motivating factor behind the bankruptcy petition." *Id.* at 1151. One court has stated that "[i]f under eighty percent (80%) of the debtor's debts were educational debts, then it is likely that the debtor has encountered financial difficulty after school, and that the bankruptcy is a result of a true need for bankruptcy relief rather than an abuse of the bankruptcy system." *Wegfehrt v. Ohio Student Loan Comm'n (In re Wegfehrt)*, 10 B.R. 826, 829 (Bankr.N.D.Ohio 1981) (quoting H.R.Rep. No. 95–595, U.S.Code Cong. & Admin.News 1978, pp. 5787, at 6094 (1977)). But there is no bright-line percentage set forth in the statute or in the case law for determining whether discharge of student-loan debt should be deemed to be the motivating factor for a bankruptcy, and the Court will not attempt to establish any such bright line in this opinion. Here, the total debt listed on Wallace's bankruptcy schedules (all of which is listed on Schedule F as unsecured nonpriority debt) is $115,638.94. Of this amount, Wallace's total student-loan debt (including debt owed to parties other than ECMC) is approximately $89,000. Thus, Wallace's student loans comprise approximately 77 percent of his total indebtedness. In some cases, such a high percentage of student-loan debt might demonstrate that the motivating

factor in the debtor's filing for bankruptcy was the discharge of the student-loan debt. The Court finds that this is not the case here. In particular, it is notable that Wallace's non-student loan debt (primarily credit-card debt and medical-related debt) in the approximate amount of $27,000 is not insubstantial for an individual of such limited means. *See Bray v. Educ. Credit Mgmt. Corp. (In re Bray)*, 332 B.R. 186, 198 (Bankr.W.D.Mo.2005) (noting, in a case in which the debtor's student-loan debt constituted approximately 80% of the debtor's total indebtedness and in which the court found that repayment of the student-loan debt would impose an undue hardship on the debtor, that "[w]hile a substantial percentage of the indebtedness listed on Schedule F which the Debtor seeks to discharge is related to his several student loans, substantial medical and credit card debts are also listed"). Under the circumstances, the Court concludes that the third *Rice* factor does not weigh against a good-faith finding in favor of the Debtor.

Based on the foregoing, as things stand now, the Court is prepared to find that Wallace has satisfied the third prong of the *Brunner* test. That could change, however, if Wallace fails to make payments to ECMC as directed below.[8] *See Douglas*, 366 B.R. at 262 ("The rule ... that good faith efforts to repay should continue after the case filing and even after the filing of an adversary proceeding on dischargeability of the student loans, is a sound and reasonable rule.").

## B. Equitable Relief Under § 105

The basis for a nondischargeability action usually is grounded in a particular fact or set of facts that could not possibly change after trial. For example, a debt alleged to be "for willful and malicious injury by the debtor to another entity or to the property of another entity" under § 523(a)(6) either is or is not such a debt based on events that occurred in the *past*. By contrast, where a debtor requests that a student-loan debt be discharged under § 523(a)(8), a court must look into the *future* to determine whether the debtor's current state of affairs is likely to persist. In many instances, the debtor's circumstances are "strongly suggestive of continuing inability to repay over an extended period of time," *Brunner*, 831 F.2d at 396, and the presiding court therefore is able to make an immediate decision that repayment of the student-loan debt would impose an undue hardship. In other instances, however, the debtor's prospects are not so strongly suggestive of the debtor's future inability to pay. In those circumstances, it is an appropriate exercise of a bankruptcy court's equitable power under § 105(a) of the Bankruptcy Code to stay a ruling on the dischargeability of student-loan debt in order to see whether future events would render the ruling inappropriate.[9] *See Cheesman v. Tenn. Student Assistance Corp. (In re Cheesman)*, 25 F.3d 356, 360–61 (6th Cir.1994). In *Cheesman*, the bankruptcy court had held that the debtors' student-loan debts were dischargeable, but had stayed its order for 18 months because the "financial situation [of the debtors] might improve in the near future, thereby making discharge unwarranted." *Cheesman*, 25 F.3d at 361. According to the bankruptcy court in *Cheesman*, the matter was, as is the instant adversary proceeding for this Court, "as difficult a case" as it had ever had to decide. *Cheesman*, 25 F.3d at 360. The

---

**8.** Of course, nothing in this Order prevents Wallace from seeking relief from it if his circumstances change for the worse after the date of trial.

**9.** Under § 105(a), the Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

district court affirmed the *Cheesman* bankruptcy court's decision, as did the Sixth Circuit Court of Appeals, which concluded that the bankruptcy court had "appropriately attempted to balance the Bankruptcy Code's goal of providing a fresh start to [the debtors] ... with Congress's goal of preventing abuse of the student loan program." *Cheesman*, 25 F.3d at 361. *See also Hornsby*, 144 F.3d at 439 ("In *Cheesman* ... we recognized the bankruptcy court's power to stay its order of discharge as an exercise of the equitable powers codified in § 105(a).").

Other courts have entered similar types of hybrid orders. *See Simmons v. United States Dep't of Educ. (In re Simmons)*, 334 B.R. 632, 638 (Bankr.C.D.Ill.2005), *aff'd*, 2006 WL 2556581 (C.D.Ill. Aug.31, 2006) (declining to rule that the debtor's student-loan debt was dischargeable, but deferring payment of the debt for four years, after which time the debtor could request additional relief from the court); *Bard–Prinzing v. Higher Educ. Assistance Found. (In re Bard–Prinzing)*, 311 B.R. 219, 229 (Bankr.N.D.Ill.2004) ("The trial judge may defer ruling until the debtor's financial situation has settled ... or may stay entry of judgment on the debtor's Adversary Complaint to see whether the undue hardship remains."). In *Bard–Prinzing*, the bankruptcy court entered judgment in favor of the defendant student-loan creditor but stayed the effective date of the judgment for one year in order to later review whether the debtor's current financial status was "likely to persist." *Bard–Prinzing*, 311 B.R. at 230. As another bankruptcy court has explained:

> Although Dennehy's student loans are non-dischargeable, that does not preclude this court from fashioning an equitable remedy. Generally, the availability of a remedy is determined by whether or not "undue hardship" is found: if an "undue hardship" exists, then a total discharge is granted, if no "undue hardship" exists, then the loans are excepted from discharge. However, some courts do not see the dischargeability of students loans as an all or nothing proposition. Instead, these courts use equitable remedies such as partial discharge, deferred payment of the student loans, deferred accrual of interest, or stay the court's order when the student loans are non-dischargeable, but the debtor is not immediately able to commence payment of the debt.... Although there is no standard developed to determine when one of these equitable remedies is appropriate, the facts of the cases using these remedies usually have one similarity—there is no indication that the current financial restraints will persist into the future and therefore, the loans are non-dischargeable.... I am presented with the same factual situation: Dennehy has failed to prove his financial condition will persist into the future, and therefore, his loans can not be discharged by this court. However, like the cases above, this case represents a situation where one of these equitable remedies is appropriate.

*Dennehy v. Sallie Mae (In re Dennehy)*, 201 B.R. 1008, 1012–13 (Bankr.N.D.Fla. 1996) (citations and footnotes omitted).

■ Likewise, the Court finds that an equitable remedy is appropriate in the instant adversary proceeding. Because he has not yet taken steps to pursue employment, Wallace has failed to illustrate that his financial condition cannot improve, and the Court therefore cannot grant even a partial discharge. However, as the court recognized in a decision on which ECMC itself has relied, Wallace "should be given a window of opportunity to recover from his current financial situation." *Whitener*, 2008 WL 207550 at *2. In *Whitener*, the debtor had been nearly blind since childhood. Despite finding that the debtor had

failed to prove the first two prongs of the *Brunner* test, the bankruptcy court directed the debtor to pay a reduced amount of $50 per month for a period of two years. *See Whitener,* 2008 WL 207550 at *2. Such an approach is even more appropriate here given that Wallace, who became blind as an adult, might need additional time to adjust to his situation. In light of the possibility that Wallace might need to partner with BSVI and might need additional training in order to find employment (if doing so is possible at all), the Court believes that scheduling the status conference for approximately two years from now should afford Wallace adequate time in which to explore his employment opportunities.

### IV. Conclusion

Wallace has satisfied the first prong of the *Brunner* test and, so long as he makes the monthly payment henceforth as ordered below, will satisfy the third prong of the *Brunner* test. But granting Wallace even a partial discharge is not appropriate because Wallace has failed to demonstrate that his state of affairs is likely to persist for a significant portion of the repayment period of the Loan. On the other hand, granting a judgment in favor of ECMC would ignore the fact that Wallace might be able to satisfy the second prong of the *Brunner* test if he is given additional time to determine his income potential (or lack thereof).

In light of the foregoing, until further order of the Court: (a) Wallace shall make payments to ECMC of $20 per month on the first day of each month commencing January 1, 2011; and (b) ECMC shall undertake no efforts to collect any amount from Wallace in excess of $20 per month. A status conference in this adversary proceeding shall be held on September 5, 2012 at 2:00 p.m. The status conference shall be in the nature of a pretrial conference to determine what additional proceedings

need to be undertaken, not for the presentation of evidence.

**IT IS SO ORDERED.**