**In re David Ernest NIXON and Elisabeth Ann Nixon, Debtors.**

**David Ernest Nixon and Elisabeth Ann Nixon, Plaintiffs,**

v.

**Key Education Resources, et al., Defendants.**

**Bankruptcy No. 08–62722. Adversary No. 09–2110.**

United States Bankruptcy Court, S.D. Ohio, Eastern Division, at Columbus.

July 19, 2011.

videoconferencing.

Susan L. Rhiel, Columbus, OH, for Debtors.

Myron N. Terlecky, Columbus, OH, Trustee.

## MEMORANDUM OPINION ON COMPLAINT SEEKING DISCHARGEABILITY OF PLAINTIFFS' STUDENT LOAN DEBTS

C. KATHRYN PRESTON, Bankruptcy Judge.

### I. Introduction

This cause came on for trial on April 4, 2011 on the Complaint of David Ernest Nixon and Elisabeth Ann Nixon (collectively, the "Debtors" or "Plaintiffs"),[1] the Debtors in the underlying Chapter 7 case, seeking a determination that the repayment of their student loan debts would impose an undue hardship on them and that the debts therefore are dischargeable under 11 U.S.C. § 523(a)(8). Present at the trial were the Plaintiffs and their attorney, Susan L. Rhiel. Also present were the attorneys for the Defendants, Jeffrey S. Rosenstiel on behalf of Educational Credit Management Corporation ("ECMC") and Geoffrey J. Peters for Key Education Resources ("Key").

This memorandum opinion constitutes the Court's findings of fact and conclusions of law. See Fed.R.Civ.P. 52 (made applicable by Fed. R. Bankr.P. 7052).

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the General Order of Reference entered in this District. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

Under the case law of the Sixth Circuit Court of Appeals discussed in section III

of this opinion, a student loan debt is nondischargeable unless the debtor can demonstrate that: (1) the debtor cannot maintain, based on current income and expenses, a minimal standard of living if forced to repay the loan; (2) additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loan; and (3) the debtor has made good faith efforts to repay the student loan. As have other courts, the Sixth Circuit Court of Appeals derived this test from *Brunner v. New York State Higher Educ. Servs. Corp.*, 831 F.2d 395, 396 (2d Cir.1987), and it therefore typically is referred to as the *"Brunner* test."

The Sixth Circuit Court of Appeals also has held that a court may grant a partial discharge of student loan debt if the debtor satisfies each prong of the *Brunner* test. *See Miller v. Penn. Higher Educ. Assistance Agency (In re Miller)*, 377 F.3d 616, 624 (6th Cir.2004). The Court will grant the Plaintiffs such a discharge in the instant case. As explained in detail below, the Court concludes that the Plaintiffs have met, by a preponderance of the evidence: (1) the minimal-standard-of-living prong of the *Brunner* test; (2) the additional-circumstances prong of the *Brunner* test with respect to any amounts due or accruing on the student loans in excess of $214,200; and (3) the good-faith-efforts-to-repay prong of the *Brunner* test.

### II. Findings of Fact

The findings of fact that are relevant to the determination of whether the Plaintiffs have satisfied the three prongs of the

---

**1.** For ease of reference, the Court will refer to each of the Debtors individually by his or her    first name.

*Brunner* test are set forth below. The Court makes these findings of fact based on: (a) the items of which it has taken judicial notice;[2] and (b) the evidence adduced at trial, including the exhibits admitted into evidence[3] and the testimony elicited from the only witnesses, the Plaintiffs.

## A. Elisabeth's Relevant Medical History

As a teenager, Elisabeth was diagnosed with bipolar disorder. According to her most recent diagnosis, Elisabeth, now 44 years of age, currently has the level one form of that disease.[4] When not properly controlled by medication and other therapies, the disease causes extreme highs and lows. Elisabeth describes the highs—or manic episodes—as times of near euphoria, when ideas come quickly, when she feels confident and even invincible, when she is inclined to undertake multiple projects and when she is unable to rest, ultimately resulting in visual and auditory hallucinations. By contrast, she describes the lows—or depressive episodes—as periods of severe depression characterized by the inability to leave her house and, at times, suicidal thoughts, leading her to attempt suicide on several occasions in the past.

### 1. Effect on Spending Habits

As a result of her bipolar disorder, Elisabeth has sometimes engaged in impulsive behavior, including spending sprees. *See* Exhibit 26, 5/18/06 Progress Note by Dr. Christopher Blank ("She also reported an episode of impulsive spending. Apparently she has spent $4,000 on a variety of superfluous items this past month. This represents a serious financial difficulty for the patient and her husband. She has yet

---

**2.** ECMC requested that the Court take judicial notice of certain facts related to the Income Based Repayment Plan and its calculations thereunder (Doc. 36) (the "IBR Document"). At trial, the Plaintiffs consented to the Court taking judicial notice of the IBR Document, and the Court has done so. In addition, the Court issued a notice indicating its intent to take judicial notice of: (1) the contents of a document published by the National Institute of Mental Health entitled "Bipolar Disorder," available at http://www.nimh.nih.gov/health/publications/bipolardisorder/complete-index.shtml ("NIMH Booklet"); and (2) the documents filed in, and information entered on the docket of, the Debtors' bankruptcy case, including, without limitation, the Debtors' schedules of assets and liabilities and statement of financial affairs ("Notice") (Doc. 41). In the Notice, the Court provided the parties 21 days to object to the Court taking judicial notice of the specified documents and information. No party filed an objection. Accordingly, the Court has taken judicial notice of the items set forth in the Notice.

**3.** The parties stipulated to the authenticity and admissibility of each others' exhibits.

**4.** According to the NIMH Booklet:

Bipolar disorder, also known as manic-depressive illness, is a brain disorder that causes unusual shifts in mood, energy, activity levels, and the ability to carry out day-to-day tasks. Symptoms of bipolar disorder are severe. They are different from the normal ups and downs that everyone goes through from time to time. Bipolar disorder symptoms can result in damaged relationships, poor job or school performance, and even suicide. But bipolar disorder can be treated, and people with this illness can lead full and productive lives.

People with bipolar disorder experience unusually intense emotional states that occur in distinct periods called "mood episodes." An overly joyful or overexcited state is called a manic episode, and an extremely sad or hopeless state is called a depressive episode. Sometimes, a mood episode includes symptoms of both mania and depression. This is called a mixed state.

Bipolar I Disorder is mainly defined by manic or mixed episodes that last at least seven days, or by manic symptoms that are so severe that the person needs immediate hospital care. Usually, the person also has depressive episodes, typically lasting at least two weeks.

NIMH Booklet at 1, 4.

to tell her husband. Inexplicably, the patient has thrown away all her receipts and is therefore unable to return any of the items that she has purchased."). Apparently, certain medications she has been prescribed from time to time may exacerbate her excessive spending, and perhaps even her cavalier disregard for the negative effects of such spending. *See* Exhibit 26, 5/31/07 Progress Note by Dr. Christopher Blank ("I learned that she carries $50,000 in credit card debt and she is continuing to spend, last week alone she increased her debt by $1,000. On interview the patient exhibits essentially no appreciation for the consequences of this. She states, 'it's just money' with a smile and a laugh. Near the end of our session today I learned that [Elisabeth] has seen her primary care physician who started her on Effexor XR and tapered her up to 225 mg a day. This would certainly be enough to explain her moderately severe mania with euphoria and spending sprees."). There are times, however, when her spending habits are under control. For example, medical records dated August 7, 2007 state that Elisabeth "has had no further spending sprees." Exhibit 26, 8/07/07 Progress Note by Dr. Christopher Blank.

## 2. The Course of the Disease During the Time Elisabeth Was Writing Her Doctoral Dissertation

The medical records made during the period of time that Elisabeth was conducting the most extensive writing of her doctoral dissertation (2004–2006) suggest that she was at certain times relatively stable. There are times when the doctors describe her mood as "euthymic," a term intimating a relatively normal (neither manic nor depressive) mood. She is consistently "well groomed and dressed" with "good eye contact." And there are times when she appears to be facing no more than the ordinary stresses of daily adult life, or the normal difficulties faced by any student attempting to complete a dissertation in a rigorous doctorate program.

On the other hand, despite the intermittent periods of relative psychological calm, there are times when Elisabeth's mental state appears to have been potentially dangerous to herself and certainly detrimental to her performance as a student. Although she was not continuously in a mental state that posed such difficulties, the following summary paints a fair picture of Elisabeth's generally worsening mental condition during the time that she was most seriously working on her dissertation. Medical records by Dr. Ann Diller Snyder dated February 2, 2004 noted that "concentration is still occasionally a problem." Exhibit 26, 2/02/04 Note by Dr. Ann Diller Snyder. Notes dated June 15, 2004 stated that Elisabeth is "forgetting things, such as she came to her appointment yesterday an hour late, thinking her appointment was a hour later. She's losing details. Work is a struggle and she's not able to work on her dissertation." Exhibit 26, 6/15/04 Note by Dr. Ann Diller Snyder. On July 6, 2004, Dr. Synder noted that "[c]oncentration's okay" but that Elisabeth is "feeling pressure to finish her dissertation." Exhibit 26, 7/06/04 Note by Dr. Ann Diller Snyder. According to medical records dated January 20, 2005, Elisabeth felt "that her mood and anxiety symptoms have seriously impaired her functional capacity in her Ph.D. program." Exhibit 26, 1/20/05 New Patient Evaluation by Dr. Christopher Blank. Records dated February 24, 2005 stated that "she has been slow in finishing her Ph.D program and must finish her thesis by June 7th [2005] or must retake her general exams. She feels her mood and anxiety symptoms have hamstrung her." Exhibit 26,

2/24/05 Continuation of New Patient Evaluation by Dr. Christopher Blank. On July 21, 2005, Elisabeth reported that she is "now going 2 or 3 days without sleep" and "when she does sleep she sleeps only 3 hours or so." Exhibit 26, 7/21/05 Progress Note by Dr. Christopher Blank. On July 28, 2005, she stated that "she is having nearly constant suicidal ideation [and] . . . thinks of multiple different plans for how she would [commit] suicide." Exhibit 26, 7/28/05 Progress Note by Dr. Christopher Blank. On August 16, 2005, she reported that "she is still having some pyschotic symptoms in the form of visual hallucinations and paranoid thoughts, although the paranoia is decreased." Exhibit 26, 8/16/05 Progress Note by Dr. Christopher Blank. This was a time when Elisabeth's doctors were attempting to find the right cocktail of medications and when she was extremely depressed and suicidal. Records dated August 30, 2005 stated that Elisabeth "denies having any psychotic symptoms, though she did have a strange experience last week when the counselor she has been [g]oing to knew things about her that she had not told him. (I suspect that this is a lingering symptom of her psychosis.)" Exhibit 26, 8/30/05 Progress Note by Dr. Christopher Blank. In October 2005, Elisabeth's diagnosis was changed from Bipolar II to her current diagnosis, Bipolar I, which is the more severe form of the illness. *See* Exhibit 26, 10/21/05 Progress Note by Dr. Christopher Blank. A letter dated October 13, 2005 from Dr. Elizabeth T. Walz, a neurologist, stated that Elisabeth was seen on that date and that "[s]he had to reschedule her initial appointment because she was admitted to Mount Carmel with complaints of confusion and ataxia and was found to have lithium toxicity,

which required one dialysis treatment to lower her level."[5] *See* Exhibit 26, 10/13/05 Letter from Dr. Elizabeth Walz. The NIMH Booklet describes the symptoms of the type of depressive episodes that Elisabeth apparently was experiencing during this time as including "problems concentrating, remembering, and making decisions." NIMH Booklet at 2.

### 3. Elisabeth's Current Medical Condition

Both Plaintiffs appear to believe that Elisabeth's bipolar condition has improved but is not fully stabilized. She is taking the maximum dosages of the available medications. Alternative treatments include electroconvulsive therapy, which the NIMH Booklet states was formerly known as "shock therapy." NIMH Booklet at 17. At least one of her doctors has proposed electroconvulsive therapy for Elisabeth, but she has to date declined that treatment based on her belief that it would cause her to be unable to work.

A February 3, 2011 letter (*see* Exhibit 22) from Dr. Karah Harvey, one of the physicians currently treating Elisabeth, describes Elisabeth's psychological condition as follows:

> This letter is in regards to your treatment at the OSU Psychiatry Outpatient Clinic. . . . Your current diagnoses include Bipolar Disorder Type I, Panic Disorder with agoraphobia, and Post–Traumatic Stress Disorder.
>
> . . . .
>
> You have been on your current regimen of medications since 2009, which have been sufficient to maintain stability to avoid inpatient hospitalization. However you have continued to display symp-

---

**5.** Ataxia is a condition in which the patient lacks muscle coordination while undertaking everyday tasks such as walking. Lithium is sometimes administered for treatment of bipolar disorder. *See* NIMH Booklet at 10.

toms of your diagnoses which have limited your functioning. Currently you endorse moderate symptoms of depression as well as anxiety which have resulted in difficulty in performing daily activities. Your anxiety limits functioning outside of the home as you also [have] agoraphobia which results in paranoid thinking. You have been able to accommodate this limitation by having past employment that allowed you to work inside of the home.

. . . .

The current treatment plan with you is to maintain stability of your symptoms to allow you to function outside of an inpatient psychiatric setting. With appropriate treatment and compliance, you have a good prognosis to be able to function outside of an inpatient setting.

Neither Elisabeth nor her doctors contend that her bipolar disorder would prevent her from working. Elisabeth in fact desires to work and, as described below, has been seeking employment. Elisabeth also has been hospitalized for asthma (September 2006), a pulmonary embolism (October 2006) and Methicillin-resistant Staphylococcus aureus infection (commonly known as MRSA) (February 2009). In addition, she is obese, has osteoarthritis in her knees and has undergone multiple arthroscopic knee surgeries.

**B. The Plaintiffs' Educational Background, Work History and Earning Potential**

**1. Elisabeth**

Elisabeth is highly intelligent and well educated. Despite her bipolar disorder, she completed advanced placement and other college preparatory courses during high school, graduated in 1985 and matriculated at The Ohio State University ("OSU"). She majored in Russian. She left OSU in 1986 due to medical issues, but later matriculated at Ohio Dominican University ("ODU") and graduated *summa cum laude* from ODU in 1995 with a Bachelor of Arts degree in English Language and Literature. In 1997, she earned a Master of Arts degree in Popular Culture (with a concentration in Folklore) from Bowling Green State University ("BGSU"). That same year, she began her doctoral work at OSU and earned her doctorate in cultural anthropology from that institution in 2006. As discussed further below, OSU later revoked her doctorate based on plagiarism present in her doctoral dissertation; Elisabeth concedes that the plagiarism occurred, but contends that it was unintentional.

Elisabeth is a folklorist—a person who studies and documents regional, occupational and ethnic traditions—and an ethnographer—a person who bridges fields such as folklore and anthropology, living in communities to study and document them from an insider's, rather than an outsider's, point of view. Folklorists and ethnographers work for universities, archives, museums governmental entities and other institutions. In the past, Elisabeth has performed contract work for, been employed by or served as an intern for the Center for Folklore Studies at OSU, Ohio Humanities Summer Institute and the Traditional Arts in Upstate New York ("TAUNY"). She has performed services for various projects, including TAUNY's Register of Very Special Places Project and the Art for a Child's Safe America in Columbus, Ohio. She also has worked as a curriculum-design consultant, a technical writer, a translator of journals written in the Russian language, an administrative assistant and an adjunct professor. Her teaching experience includes part-time adjunct faculty positions at Franklin University, Columbus State Community College, Western Kentucky University and Otter-

bein University, earning gross income ranging from approximately $46,000 to $62,000 per year. She has primarily taught on-line courses, but also has taught in the classroom. Before her doctorate was revoked, she sought employment as a full-time professor, but was unable to obtain such a position. She lost her teaching positions in September 2010 as a result of the plagiarism and is not currently employed. Although her doctorate has been revoked, she continues to hold her other degrees. There has been no suggestion that her performance as an employee, intern or student—other than in connection with her dissertation—has been anything but exemplary. Before the revocation of her doctorate, her peers regarded her research work as important. Elisabeth's master's degree and experience would qualify her to work in the fields of administration, training, data mining and teaching as an assistant professor at educational institutions up to and including those awarding doctorates. It appears that a full-time teaching position would be the most lucrative employment available to Elisabeth. The highest starting salary she likely would earn given her educational background and experience would be as a full-time assistant professor making an annual salary of approximately $60,000. Elisabeth, however, doubts that academic institutions would hire her in light of the events described below and the effect that those events have had on her reputation.

In December 2009, Elisabeth received a letter from an attorney for Dr. Montana Miller, an assistant professor of Popular Culture at BGSU. The letter stated that several passages in Elisabeth's dissertation, which was published in 2006, were identical or substantially similar to passages in Dr. Miller's 2003 doctoral dissertation. While framed as a cease and desist letter based on copyright infringement, the letter also essentially alleged plagiarism.

In March 2010, Elisabeth reported the matter to OSU's Office of Legal Affairs, which had been sent a copy of the letter.

Elisabeth initially disbelieved Dr. Miller's allegations, but later came to the realization that she had in fact plagiarized Dr. Miller's work, albeit unintentionally. She does not recall reading Dr. Miller's dissertation, but concedes that she would have had access to it and must have seen it given the evident plagiarism of Dr. Miller's work in Elisabeth's dissertation. Although there is no doubt the plagiarism occurred, she did not intentionally commit it.

The matter ultimately was referred to OSU's Committee on Academic Misconduct ("Committee"). Elisabeth presented the Committee with, among other things, certain medical records and a position statement asserting that her dissertation, despite its problems, was based on original field work. After a hearing, the Committee concluded in May 2010 that Elisabeth had committed plagiarism. (According to OSU's policy and procedures regarding research misconduct, a finding of plagiarism can be made if the copying of another's work is done "intentionally," "knowingly," or "recklessly." *See* http://orc.osu.edu/files/2011/01/Misconduct_Policy.pdf.) The Committee recommended, among other things, the revocation of Elisabeth's doctorate. Based in part on her medical condition around the time she was writing the dissertation, Elisabeth appealed the Committee's decision to OSU's Executive Vice President and Provost, who upheld the Committee's decision and stated that there were no further appeals available at OSU. Thus, although Elisabeth continues to seek to have her doctorate reinstated, the probability of reinstatement is negligible. After the revocation of Elisabeth's doctorate, Dr. Miller filed a lawsuit in federal district court, which the parties settled. Among other things, Elisabeth agreed to pay Dr.

Miller approximately $222 a month for 45 months. The Columbus Dispatch newspaper published an article on plagiarism in higher education, highlighting Elisabeth's case and the revocation of her doctorate. This further publicized the incident and increased her professional embarrassment.

### 2. David

Now 45 years of age, David has a Bachelor of Arts degree in English from West Virginia University. He pursued creative writing at OSU, but did not finish that course of study. In 2003, he obtained a Master of Library Science degree from Kent State University. Prior to that time, he had begun working for the Columbus Metropolitan Library ("CML") as a library assistant, a position he currently holds. He has explored the possibility of obtaining promotions within the CML system, including as a librarian, and has explored positions as a librarian in other systems, but has not yet been able to obtain any position that would pay more than he is currently earning as a library assistant with CML—a total salary of approximately $30,000 per year. The highest salary he could possibly earn given his educational background and experience would be as a librarian in the CML system making approximately $40,000 annually.

### C. The Student Loans and the Plaintiffs' Repayment History

As of the date of the trial, the Plaintiffs owed more than $270,000 in the aggregate on their student loans.

### 1. Elisabeth

Elisabeth's parents paid for her undergraduate education at OSU until it was interrupted for medical reasons. Although she worked from time to time while obtaining her education and perhaps paid for some of the costs of her education out of pocket (the evidence on this point was not clear), the high amount of her student loan debt would suggest that much of her education after her undergraduate years at OSU was financed with student loans. In any event, by the time she was required to begin repaying her loans in March 2007, she had borrowed in excess of $40,000 from Key pursuant to a "private" loan and in excess of $200,000 pursuant to "government loans" from entities whose debts are now consolidated under the ECMC umbrella.[6]

As of the date of trial, Elisabeth owed approximately $37,000 on her loan with Key, which requires a monthly payment of $392.85. That payment currently is being made. In fact, from the time it entered repayment status, the Key loan has never

---

6. "ECMC is a ... not-for-profit corporation created ... to provide specialized guarantor services to the [United States Department of Education] ... including accepting transfer of title of certain student loan accounts on which the student loan borrower has filed a bankruptcy proceeding." *Jackson v. Educ. Res. Inst. (In re Jackson)*, 2007 WL 2295585, at *1 n. 3 (Bankr.S.D.N.Y. Aug.9, 2007). ECMC filed a motion to intervene as a defendant in this adversary proceeding, and the Court approved that motion by an order entered on June 17, 2009. In its Answer, ECMC states that it is the assignee of a loan once held by American Student Assistance. On October 8, 2009, the Plaintiffs filed a Notice of Dismissal of Adversary Proceeding Against Kemba Financial Credit Union, Inc. (Doc. 25). Other defendants who have not been dismissed from the adversary proceeding, but who have not actively participated in the adversary proceeding (at least not directly), are CFS Suntech Servicing, LLC ("CFS"); Chase Education Finance and Chase Student Loan Servicing LLC (collectively, "Chase") (the loans held or serviced by those Defendants are under the ECMC umbrella) and Great Lakes Educational Loan Services, Inc. (the servicer for the student loans held by Key). The final judgment that the Court will enter in accordance with this opinion will apply to CFS and Chase as well as to Key and ECMC.

been in default, with monthly payments on the loan being made (other than five months in 2008 when Elisabeth received a forbearance) either by Elisabeth's parents (from March 2007 to December 2007) or by Elisabeth. The payments Elisabeth has made since June 2008 are being made under an interest-only payment plan.

As of the date of trial, Elisabeth owed in excess of $200,000 on her loan with ECMC, which requires a monthly payment of $1,289. She is not currently making that payment. The ECMC loan (which consolidated loans from CFS and Chase) entered repayment status in March 2007. Elisabeth's parents made monthly payments in the amount of $1,131 on the ECMC loan through November 2007, for a total of $10,179. When her parents declined to make further payments, Elisabeth requested and received a deferment that lasted from December 2007 until November 2008. After that deferment period expired, Elisabeth requested and received another deferment. That deferment was cancelled upon the filing of the adversary proceeding, at which time the account was frozen and Elisabeth was advised that she need not make any payments pending the disposition of the adversary proceeding.[7]

### 2. David

David's parents paid for his undergraduate education. To finance his postgraduate education he obtained loans that ultimately were consolidated into the ECMC loan. As of the date of trial, David owed approximately $35,000 on his ECMC loan,[8] which requires a monthly payment of approximately $256. He regularly made that payment until commencing the adversary proceeding, at which time he was informed that the loan account was frozen and that he need not make any payments pending the disposition of the adversary proceeding.

### 3. The IBR

The Income Based Repayment Plan ("IBR") is a payment-plan program for federal student loans that caps required monthly payments based on household income and family size of the borrowers. Participants in the program have up to 25 years to repay their loans. One disadvantage of the IBR is the amount of interest accrual over a 25–year period. Sometime in 2009, the Plaintiffs together explored the IBR website and used the calculator

7. At trial, Elisabeth testified that she owed in excess of $200,000 to ECMC. The proof of claim filed with respect to Elisabeth's loan with ECMC asserted a claim in the amount of $204,716.02. That proof of claim was filed on April 2, 2009—after the Debtors commenced this adversary proceeding on March 11, 2009 and after, according to Elisabeth's uncontroverted testimony, the loan account was frozen pending the disposition of this adversary proceeding. ECMC has stated that "as of the date of trial" Elisabeth's loan with ECMC "will have a loan balance of $221,423.96." *See* Doc. 36. The proper amount of ECMC's claims will bear on the allocation of the undischarged amount of the student loan debts between ECMC and Key, an issue the Court will set for a hearing by separate notice.

8. At trial, David testified that he owed approximately $35,000 to ECMC. The proof of claim filed with respect to David's loan with ECMC asserted a claim in the amount of $36,185.07. That proof of claim was filed on April 7, 2009—after the Debtors commenced this adversary proceeding on March 11, 2009 and after, according to David's uncontroverted testimony, his loan account was frozen pending the disposition of this adversary proceeding. ECMC has stated that "as of the date of trial" David's loan with ECMC "will have a loan balance of $38,166.69." *See* Doc. 36. The proper amount of ECMC's claims will bear on the allocation of the undischarged amount of the student loan debts between ECMC and Key, an issue the Court will set for a hearing by separate notice.

on that website [9] to calculate payments under the IBR. Based on the income used by ECMC in the IBR Document, and based on an interest rate of 6.8% per annum (which is the interest rate used in the IBR Document), the Plaintiffs' payment under that program would be approximately $325 per month for the ECMC loans. Although paying that amount rather than the full contractual monthly payment was attractive to Plaintiffs, they declined to enter the IBR. They calculate that, due to the continuing interest accrual, paying such a small amount, even over a 25–year term, would result in payment of less than one-third of the loan. As a result, the Plaintiffs are concerned that they could suffer a large tax liability for forgiveness-of-indebtedness income at that point in time, when they would be in their late 60s.

## D. The Plaintiffs' Bankruptcy Case

On December 31, 2008, the Debtors filed their voluntary joint Petition for Relief under Chapter 7 of the Bankruptcy Code. On March 3, 2009, the Chapter 7 Trustee entered a report on the case docket stating that she had "neither received any property nor paid any money on account of this estate" and "that there is no property available for distribution from the estate over and above that exempted by law." On June 3, 2009, the Court entered an order granting the Plaintiffs a discharge of most of their debts. According to the Schedules, among other debts that would have been discharged, they owed approximately $148,000 on various credit cards, store credit and other non-student loan credit arrangements. Of this amount, according to the Schedules, approximately

$133,000 was incurred by Elisabeth alone and approximately $15,000 by David alone. The Plaintiffs incurred a debt on a 2003 Honda CRV ("CRV") in 2003 or 2004 (original loan amount was $24,125.96) and on a 2005 Honda Civic ("Civic") in December 2004 (original loan amount was $12,945.87).

## E. The Plaintiffs' Financial Situation as of the Date of Trial

### 1. Assets

The Plaintiffs own, jointly in fee simple, property located at 226 E. Royal Forest Blvd., Columbus, Ohio ("Residence"). The Residence has a current value of $130,000, subject to a mortgage in the amount of $125,500. They own, among other personal property, two vehicles: the Civic, valued at $8,350 and the CRV, valued at $7,300 (collectively, the "Vehicles"). They also have two retirement accounts (collectively, the "Retirement Accounts")—Elisabeth's with the State Teachers Retirement System of Ohio and David's with the Ohio Public Employees Retirement System— with account balances of approximately $21,000 and $33,000, respectively. *See* Schedule B. On Schedule C, the Plaintiffs claimed partial exemptions in the Residence and the Vehicles. The Plaintiffs claimed full exemptions in the Retirement Accounts.[10]

### 2. Income

As of the date of trial, the Plaintiffs combined average monthly income, including Elisabeth's unemployment income, was $3,176.79.

### 3. Expenses

The Plaintiffs estimate their average monthly expenses as of the date of the trial to include the following:

---

**9.** *See* (http://studentaid.ed.gov/PORTALSWeb App/students/english/IBRCalc.jsp).

**10.** On the date they commenced their bankruptcy case, the Debtors filed a Statement of Intent indicating that they would retain the Residence as well as the Vehicles.

| | |
|---|---|
| Home mortgage: | $1,126 |
| Utilities and Refuse: | $252 |
| Home Maintenance: | $66 |
| Telephone: | $68 |
| Cell Phone: | $67 |
| Cable/Internet: | $126 |
| Food: | $200 |
| Clothing: | $73.67 |
| Medical/dental: | $240.17 |
| Transportation (not incl car payment) | $206 |
| Recreation: | $25 |
| Life Insurance: | $216 |
| Car insurance: | $164 |
| Additional taxes: | $166 |
| Elisabeth's student loan payment | $392.85 |
| Pet Food & Care: | $40 |
| Rhiel & Assoc. | $200 |
| McNees, Wallace, Nurick | $200 |
| *Miller v. Nixon* Settlement | $222.22 |
| Total: | $4,050.91 |

The Plaintiffs claim that their home has substantial deferred maintenance, including original windows that need to be replaced, a driveway full of sinkholes and tile in the bathroom in need of repair or replacement. The Plaintiffs did not provide an estimate of the total costs of making the necessary repairs to the Residence, but the costs apparently are covered by the $66 per month for home maintenance set forth above.

## F.   The Plaintiffs' Spending Habits

Although her spending was under control at the time of trial, Elisabeth has in the past engaged in exorbitant spending sprees, which the Plaintiffs characterize as bipolar induced. For example, Elisabeth has in the past spent thousands of dollars at a time on multiple sets of items such as shoes and salt and pepper shakers. On the other hand, both Plaintiffs have at times lived beyond their means in a manner not entirely reflective of spree spending. For example, David, who has not been diagnosed with bipolar disorder or any other disorder associated with the symptom of spree spending, has at times— including after commencing his bankruptcy case—spent hundreds of dollars on items

such as cigars, video games and video-game systems. And Elisabeth also has at times overspent on a more systematic basis than would be typical of bipolar-induced spree spending. For example, every month or two she would spend two to three hundred dollars on a haircut and/or hair coloring and also would fairly regularly spend excessive amounts on eyebrow waxing, pedicures and/or manicures, nail care treatments and facials. She frequently spent between $4 and $10 at Starbucks in a single day. She also purchased video games and, despite having premium movie channels, went out regularly to movie theaters. By way of example, in the year-long period from May 2008 through April 2009, Elisabeth spent approximately $5,120 in the aggregate—an average of $426 per month—on beauty services and products and expensive coffee drinks. The Plaintiffs overspent in this regular fashion during times when Elisabeth's ECMC loans were in deferment status and during the bankruptcy case while both of their ECMC loans had been frozen and ECMC had advised them that they need not pay pending the outcome of the adversary proceeding. The Court is troubled by such overspending. Elisabeth herself agrees that such spending is unreasonable, but contends that it was symptomatic of her bipolar disorder. The Court considers it unlikely that such systematic overspending is characteristic of bipolar disorder. The Plaintiffs have curtailed their excessive spending the last several months in order to remain within their current budget. To some extent this is a result of Elisabeth no longer using credit cards, but this also demonstrates that both Elisabeth and David can restrain their spending when appropriate limits are put in place.

## G.   The Plaintiffs' Efforts to Obtain Other Employment

Elisabeth has been diligently searching for work since losing her teaching posi-

tions. She has submitted four to five job applications per week to the State of Ohio, local hospitals and other area businesses. Limited by her weight and osteoarthritis in both knees, she does not apply for jobs that would require significant standing (such as working as a store clerk). Because of her bipolar disorder, she also has not applied for positions likely to induce high levels of stress. Consistent with those restrictions, she has applied for positions as an office/administrative assistant, a clerical associate, a data entry clerk, and imaging clerk and a customer service assistant. The average pay for the jobs for which she has been applying is approximately $15 an hour. She has not yet been able to obtain any such position. She has not, however, applied for positions in which she would use her particular skill set, which includes college-level teaching, folklore, ethnography, technical writing and Russian translation. According to Elisabeth, she has not applied for teaching positions because of her embarrassment and her belief that no one would hire her for such positions given her recent notoriety. She continues to believe, though, that she remains eminently qualified for teaching positions and there is no reason to believe she is not.

Also, she remains qualified to work in many other positions in her field. She concedes that her bipolar disorder and other medical conditions would not prevent her from being successfully employed in those positions. Quite simply, she has not sought such positions since losing her teaching posts. In the meantime, it was reasonable for her to seek lower-paying jobs. Elisabeth has attempted to maximize her income as much as she reasonably could have been expected to over the past year. Going forward, however, she needs to do more.

In light of (1) the large number of community colleges and other institutions that offer online courses and other courses such as those Elisabeth has taught in the past, (2) the likelihood that Elisabeth could teach those courses from her home at institutions across the United States (and perhaps even the world), (3) the fact that she has successfully taught four or more such classes at a time while earning gross pay up to $62,000 and (4) the fact that the highest starting salary she could possibly be expected to earn given her educational background and experience would be as a full-time assistant professor making an annual salary of approximately $60,000, the Court concludes that Elisabeth could reasonably be expected to earn $60,000 a year. Given his background and his current income of approximately $30,000 per year, and his testimony that he has applied for but been unsuccessful in obtaining higher-paying positions as a librarian, the Court concludes that David could reasonably be expected to continue to make $30,000 per year. Thus, the total potential income for Elisabeth and David is $90,000 a year in the aggregate. Plugging that amount into the IBR calculator (of which the Plaintiffs stipulated the Court could take judicial notice), the Court concludes that additional circumstances suggest that the Plaintiffs, if they become fully employed and minimize their expenses, together should be able to pay $850 per month, or $10,200 per year, on their student loans. Moreover, a finding that the Plaintiffs would have the ability to make monthly payments in the aggregate amount of $850 if they had gross income of $90,000 per year is reasonable in light of the expenses set forth in their current budget.

### III. Conclusions of Law

### A. Discharge of Student Loan Debts

The Court has granted the Plaintiffs a discharge. Section 523(a)(8) of the Bankruptcy Code, however, provides that:

a discharge ... does not discharge an individual debtor from any debt—

. . . .

*unless excepting such debt from discharge under this paragraph would impose an undue hardship on the debtor* and the debtor's dependents, for—

(A)(i) an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution; or

(ii) an obligation to repay funds received as an educational benefit, scholarship, or stipend; or

(B) any other educational loan that is a qualified education loan, as defined in section 221(d)(1) of the Internal Revenue Code of 1986, incurred by a debtor who is an individual[.]

11 U.S.C. § 523(a)(8) (emphasis added).

■■■ There is no dispute that the Plaintiffs' students loans are governed by § 523(a)(8). Thus, the loans are dischargeable only if the Plaintiffs can prove that their repayment would impose an undue hardship on them. *See Barrett v. Educ. Credit Mgmt. Corp. (In re Barrett)*, 487 F.3d 353, 359 (6th Cir.2007). In order to establish undue hardship under Sixth Circuit law, a debtor must demonstrate the following:

(1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living ... if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.

*Oyler v. Educ. Credit Mgmt. Corp. (In re Oyler)*, 397 F.3d 382, 385 (6th Cir.2005) (quoting *Brunner*, 831 F.2d at 396). The Plaintiffs have the burden of proving each of the three prongs of undue hardship under the *Brunner* test by a preponderance of the evidence. *See Barrett*, 487 F.3d at 359.

**B. Prong One: Minimal Standard of Living**

■■■ Under the first prong of the *Brunner* test, the Plaintiffs must demonstrate that they cannot maintain, based on their current income and expenses, a minimal standard of living if forced to repay their student loans. The relevant date for determining whether the Plaintiffs have met the minimal-standard-of-living prong is the date of trial. *See Sorber v. New York State Higher Educ. Servs. Corp. (In re Sorber)*, 358 B.R. 68, 74 (Bankr.N.D.N.Y. 2006); *Cota v. United States Dep't of Educ. (In re Cota)*, 298 B.R. 408, 414 (Bankr.D.Ariz.2003).

The Court has previously held that the contours of the phrase "minimal standard of living" should be roughly defined as follows:

[A] minimal standard of living in modern American society includes these elements:

1. People need shelter, shelter that must be furnished, maintained, kept clean, and free of pests. In most climates it also must be heated and cooled.

2. People need basic utilities such as electricity, water, and natural gas. People need to operate electrical lights, to cook, and to refrigerate. People need water for drinking, bathing, washing, cooking, and sewer. They need telephones to communicate.

3. People need food and personal hygiene products. They need decent clothing and footwear and the ability to

clean those items when those items are dirty. They need the ability to replace them when they are worn.

4. People need vehicles to go to work, to go to stores, and to go to doctors. They must have insurance for and the ability to buy tags for those vehicles. They must pay for gasoline. They must have the ability to pay for routine maintenance such as oil changes and tire replacements and they must be able to pay for unexpected repairs.

5. People must have health insurance or have the ability to pay for medical and dental expenses when they arise. People must have at least small amounts of life insurance or other financial savings for burials and other final expenses.

6. People must have the ability to pay for some small diversion or source of recreation, even if it is just watching television or keeping a pet.

*Wallace v. Educ. Credit Mgmt. Corp. (In re Wallace)*, 443 B.R. 781, 787–88 (Bankr. S.D.Ohio 2010) (quoting *Ivory v. United States (In re Ivory)*, 269 B.R. 890, 899 (Bankr.N.D.Ala.2001)). Another bankruptcy court made the following helpful observation regarding the *Ivory* factors:

I find the list set forth in *Ivory* a helpful starting point in assessing the contours of a minimal standard of living. While reference to the *Ivory* list is helpful in the minimal standard of living inquiry, courts should be careful not to apply it mechanically or inflexibly. Rather, in appropriate circumstances, the court must be prepared to depart from the list based on its own experiences, common sense, knowledge of the surrounding area and culture, and assessment of the reasonableness of what debtor claims he or she needs. In addition, what is minimal can and probably should change over time (*e.g.*, with new technology driving down the costs of

things that might have previously been cost prohibitive).

*Miller v. Sallie Mae, Inc. (In re Miller)*, 409 B.R. 299, 312 & n. 26 (Bankr.E.D.Pa. 2009).

■ In addition, courts have held that "minimal" does not mean "preexisting" (*i.e.*, the lifestyle the debtor has been living) or "comfortable," but also does not mean "reduced to poverty." *See, e.g., Educ. Credit Mgmt. Corp. v. Stanley*, 300 B.R. 813, 818 (N.D.Fla.2003); *Campton v. U.S. Dep't of Educ. (In re Campton)*, 405 B.R. 887, 891 (Bankr.N.D.Ohio 2009) ("While a minimal standard of living does not mandate that a debtor live in poverty to qualify for a discharge of their student-loan obligation, it does mean that the debtor is expected to do some financial belt-tightening and forego amenities to which he may have become accustomed."). Debtors must demonstrate that they have taken steps to maximize their income and minimize their expenses. *See Tenn. Student Assistance Corp. v. Hornsby (In re Hornsby)*, 144 F.3d 433, 438 (6th Cir.1998).

**1. Maximizing Income**

**a. Elisabeth**

■ In order to satisfy the first prong of the *Brunner* test, debtors must demonstrate that they have attempted to maximize their income by seeking work that would allow repayment of their student loan debts. *See Oyler*, 397 F.3d at 386. In most of the reported decisions in which courts have held that highly-educated debtors such as Elisabeth failed to fully maximize their income, the courts have done so because the debtors were unwilling to seek employment outside of their fields. *See, e.g., Tirch v. ʻPenn. Higher Educ. Assistance Agency (In re Tirch)*, 409 F.3d 677, 681 (6th Cir.2005) ("Tirch should have sought employment in another

field when the stress of clinical social work became debilitating."); *Goulet v. Educ. Credit Mgmt. Corp.*, 284 F.3d 773, 779 (7th Cir.2002) ("[E]ven if Goulet's prospects in the mental health field or the insurance industry are foreclosed, there is no evidence that Goulet is unemployable in other areas. Rather, the record indicates that Goulet has simply failed to diligently pursue employment such that he would be able to alleviate his financial burdens."). This is not the case with Elisabeth, who has diligently applied for numerous entry-level positions.[11] On balance, especially given her pursuit of other employment, the Court concludes that Elisabeth has satisfied the first prong of the *Brunner* test with respect to the requirement of attempting to maximize her income.

### b. David

David is currently employed full-time as a library assistant at CML, the largest library system in Central Ohio. He has sought promotions and better-paying positions both inside and outside of CML, albeit to no avail as of the date of trial. Employment opportunities for persons trained as general librarians (*i.e.*, those who are not trained in a specific area of library science) are few and far between. Moreover, there is no indication that David's skill set could be utilized to obtain higher paying employment in another field. The Court, therefore, concludes that David has attempted to maximize his income.

### 2. Minimizing Expenses

To establish the first prong of the *Brunner* test, the Plaintiffs also must demonstrate that they have taken steps to minimize their expenses. Certain of their

expenses (such as food) are extremely low. Although they arguably could have reduced certain other expenses to some degree, the Court concludes on balance that they have taken adequate steps to minimize their expenses.

### a. Housing Expenses

■ During the repayment period, the Plaintiffs have continued to live in the Residence and pay approximately $1,444 per month for the mortgage and other costs associated with home ownership. In determining the standard of living that would be appropriately minimal for debtors, some courts have held that home-owning debtors must, if they can, move to more affordable housing. As one bankruptcy court has observed, "[t]here is nothing to suggest that [the debtor] cannot find less expensive housing [and] [w]hile the Court acknowledges that [this would entail] significant reductions and include giving up ownership of a home, such reductions are expected under section 523(a)(8) and relevant case law." *Grove v. Educ. Credit Mgmt. Corp. (In re Grove)*, 323 B.R. 216, 228 (Bankr.N.D.Ohio 2005). Another bankruptcy court has further noted that "[w]hile owning a home is a major part of the American dream and is usually a way to build equity, it should not come at the expense of the Debtor's student loan creditors[.]" *Block v. U.S. Dep't of Educ. (In re Block)*, 273 B.R. 600, 607 (Bankr. W.D.Mo.2002).

In the instant case, the evidence illustrates that the Plaintiffs might be able to save $100 to $200 a month if they were to sell the Residence and pay rent instead. In today's market, however, their prospects for selling the Residence for a price sufficient to pay the outstanding amount of

---

11. In light of her medical conditions, Elisabeth has applied for positions that would not require standing and that would not be overly stressful. The Court finds those to be reasonable criteria under the circumstances.

the mortgage are speculative at best, especially considering the home's considerable deferred maintenance. Accordingly, the Court concludes that the Plaintiffs have minimized their expenses even though they have not attempted to sell the Residence or move to less expensive housing.

### b. Internet, Cable and Telephone Expenses

■ As of the date they commenced their bankruptcy cases, the Plaintiffs were spending $130 for cable and Internet, $130 for cell phones and $80 for other phone services. As of the date of trial, they were spending $126 for cable and Internet, $67 for cell phones and $68 for landline telephone. Some courts have held that such expenses (other than basic telephone) are unnecessary for a debtor to maintain a minimal standard of living and that the debtor's failure to reduce those expenses may evidence lack of good faith. *See Educ. Credit Mgmt. Corp. v. Mosko (In re Mosko),* 515 F.3d 319, 325 (4th Cir.2008). The Court, however, concludes that the Plaintiffs' telecommunications expenses are reasonable under the circumstances because they permit the Plaintiffs to have a source of entertainment and allow Elisabeth to apply for employment online. In addition, the Internet service would facilitate her work, once she obtains it, as a professor in higher education or some other field for which she is qualified. *See Educ. Credit Mgmt. Corp. v. Frushour (In re Frushour),* 433 F.3d 393, 400 (4th Cir. 2005) ("ECMC is mistaken to suggest that having Internet and cable connections requires the conclusion that Frushour maintains more than a minimal standard of living. Such a per se rule would simply be too harsh. It cannot be said that the transmission of information, whether via Internet or cable, is always unnecessary to maintain a minimal standard of living, especially for those who work from home."

(citations and internal quotation marks omitted)).

### c. Payments to the Plaintiffs' Bankruptcy and Litigation Counsel and to Dr. Miller

The Defendants take issue with the Plaintiffs budgeting for payments to be made to their bankruptcy counsel (Ms. Rhiel's firm) as well as payments to Dr. Miller and the firm who represented Elisabeth in connection with the defense and settlement of the lawsuit commenced by Dr. Miller. The Court, however, need not reach this issue. Even if those payments, which aggregate $622.22 per month, were eliminated from the Plaintiffs' budget, their monthly expenses would be $3,428.69, which is more than their combined average monthly income of $3,176.79. Thus, even if the Plaintiffs were to eliminate the payments to their counsel and Dr. Miller from their budget, they still would be unable to maintain, based on their current income and other expenses, a minimal standard of living if forced to repay their student loans.

### 3. Conclusion Regarding Minimal–Standard–of–Living Prong

■ On balance, the Court finds that the Plaintiffs' current budget reflects an effort to minimize expenses. Based on that factor, as well as the Plaintiffs' attempts to maximize their income, the Court concludes that the Plaintiffs have met the minimal-standard of-living prong of the *Brunner* test.

### C. Prong Two: Additional Circumstances

■ In order to demonstrate the second prong of the *Brunner* test—that additional circumstances exist indicating that their state of affairs is likely to persist

for a significant portion of the repayment period of the student loans—the Plaintiffs "must show that circumstances indicate a certainty of hopelessness, not merely a present inability to fulfill financial commitment." *Barrett*, 487 F.3d at 359 (internal quotation marks omitted). Such circumstances "may include, but are not limited to, illness, disability, a lack of useable job skills, or the existence of a large number of dependents,"[12] but "[u]ltimately, the most important factor in satisfying the second prong is that the additional circumstances must be beyond the debtor's control, not borne of free choice." *Barrett*, 487 F.3d at 359 (citations and internal quotation marks omitted).

### 1. Elisabeth's Medical Conditions

Courts consider illness and disability when applying the additional-circumstances prong of the *Brunner* test. Elisabeth has bipolar disorder level I.[13] Several courts have addressed the additional-circumstances prong of the *Brunner* test in the context of bipolar disorder, with mixed results, primarily depending on the severity of the disorder and its likely effects on the debtor's ability to work. *Compare Dewey v. Sallie Mae, Inc. (In re Dewey)*, 381 B.R. 681, 685 (Bankr.W.D.Tenn.2008) (lack of evidence that bipolar disorder disqualified debtor from employment prevented him from satisfying the additional-circumstances prong); *and Dennehy v. Sallie Mae (In re Dennehy)*, 201 B.R. 1008, 1012 (Bankr.N.D.Fla.1996) (holding that debtor with bipolar disorder failed to establish that the disease would prevent him from obtaining employment in the future) *with Zook v. Edfinancial Corp. (In re Zook)*, 2009 WL 512436, at *10 (Bankr.D.C. Feb.27, 2009) (holding that severe bipolar disorder was an additional circumstance demonstrating that the debtor's present inability to repay her student loans while still maintaining a minimal standard of living was likely to persist into the foreseeable future); *and Kelsey v. Great Lakes Higher Educ. Corp. (In re Kelsey)*, 287 B.R. 132, 144 (Bankr.D.Vt.2001) (discharging student loan debt of debtor with bipolar disorder and other mental disorders that were "severe, debilitating, life threatening, longstanding" and that "have con-

---

**12.** The Plaintiffs do not have any dependents.

**13.** Elisabeth is permitted to testify "concerning [her] diagnosis ... and how [her] health affects [her] life and limits [her] ability to work." *Barrett*, 487 F.3d at 362. She did not offer corroborating expert medical testimony, but she was not required to do so in order to meet her burden of establishing undue hardship. *See Barrett*, 487 F.3d at 359–60. In lieu of corroborating expert testimony, the Sixth Circuit has suggested several alternatives means of providing corroborating evidence of a debtor's medical condition and/or the effect it will have on the future ability to earn income: "[m]edical bills, letters from treating physicians, and other indicia of medical treatment aside from medical records or expert medical testimony." *Barrett*, 487 F.3d at 361. In the instant adversary proceeding, the Defendants did not object to the authenticity or admissibility of Elisabeth's medical records, including the letters from her doc-

tors, which established by a preponderance of the evidence that she has Bipolar Disorder I.

In addition, a court "may take judicial notice of the effect that a debtor's well-known medical condition may have on the debtor's ability to earn a living." *Hertzel v. Educ. Credit Mgmt. Corp. (In re Hertzel)*, 329 B.R. 221, 232 (6th Cir. BAP 2005). *See also Nash v. Connecticut Student Loan Foundation (In re Nash)*, 446 F.3d 188, 193 (1st Cir.2006) (relying on the National Institute of Mental Health's booklet regarding bipolar disorder in concluding that individuals with the debtor's particular type of bipolar disorder "may lead productive lives with proper treatment"); *Doherty v. United Student Aid Funds, Inc. (In re Doherty)*, 219 B.R. 665, 670 (Bankr.W.D.N.Y. 1998) (taking judicial notice of effects of bipolar disorder found in publications by the National Institute of Mental Health and other agencies).

tinued to defy successful treatment over time"). In the instant adversary proceeding, Elisabeth does not contend that her bipolar disorder or other medical conditions would prevent her from working in her fields of expertise.

### 2. The Plaintiffs' Future Employment

In conducting the additional-circumstances analysis, courts also consider the debtor's useable job skills. Both of the Plaintiffs have such skills. As discussed in more detail below, if Elisabeth were to fully utilize her education and experience, the Plaintiffs should be able to earn $90,000 per year in the aggregate.

Elisabeth has not applied for teaching positions or other positions in her fields of expertise. Yet she cannot fully satisfy the additional-circumstances prong without doing so. *See Oyler*, 397 F.3d at 386. True, she has not applied for teaching positions due to the embarrassment she feels as a result of the events relating to the revocation of her doctorate and her belief that she will not be hired because of her reputation. The Court is not persuaded, however, that she will never again be able to work as a professor, folklorist or ethnographer. The Court reaches these conclusions for several reasons. First, she has a master's degree in her field. She admits that this degree, combined with her experience, would make her highly qualified for a variety of positions, including teaching at the college level. There are many institutions other than OSU, BGSU and the institutions at which she has previously taught where she could teach either in the classroom or online. Second, Elisabeth contends that her plagiarism was unintentional, induced by a combination of her bipolar disorder and the cocktail of medications she was taking at the time. Before word processing and the advent of the "find and

replace function," and before the Internet era—when materials became readily available to be cut and pasted—it would have been nearly impossible to commit plagiarism to the extent that Elisabeth did and to do so unintentionally. Even today, such extensive plagiarism is unlikely to be unintentional in the typical case. But Elisabeth, who was experiencing confusion, psychosis, depression and suicidal ideation while she was writing her doctoral dissertation, could have committed the plagiarism unintentionally and not realized that she had done it or not remembered that she accessed the plagiarized materials. All that would have been required would have been cutting and pasting, searching and replacing and making minor revisions. *See* David L. Lee, *High–Tech Traps*, 8–Nov. CBA Rec. 52, 52 (November 1994) ("The final common cut-and-paste error can be more subtle, but also comes from a simple recipe: download a case or a law review article, find a good quote, electronically cut-and-paste it into your document, forget to add quote marks or forget to add the cite, let sit a few days, and *voilà* unintentional plagiarism. You can cook up the same result by taking notes on your computer and using the notes in your document without adding quote marks or a cite. Unintentional plagiarism can also result from properly citing material in your document, then cutting-and-pasting it within your document, leaving the cite behind or having the cite be only an enigmatic *'Id.'* "). Again, this is not something that would happen unintentionally in the typical case to the extent it occurred in Elisabeth's doctoral dissertation, but it is possible for someone who was in the mental place where Elisabeth was during the time she was completing her dissertation. The Court found Elisabeth to be a credible witness on this point.

Elisabeth might well have been unemployable in academia if she had committed

the plagiarism intentionally. By contrast, in light of her persuasive argument that she committed the plagiarism unintentionally, she should at least be able to continue to obtain positions as an adjunct professor primarily responsible for teaching. The Court, therefore, concludes that, despite her past, Elisabeth should be seeking employment as a professor and also should be seeking other positions for which she is qualified in light of her skill set and considerable capabilities (including technical writing and Russian translation). Because she has not recently explored opportunities in those areas, she was unable to produce any evidence that she has been denied any.[14] She did not produce evidence that she will be unable to obtain such a position within the repayment period of the loans. It is reasonable to believe that her past may result in some narrowing of her opportunities. It appears unlikely that she will ever be hired by OSU, which revoked her degree, or BGSU, where Dr. Miller is an assistant professor. Nonetheless, she presented no evidence that her opportunities will be completely restricted to entry-level positions. The Court, therefore, cannot say that her past will inevitably and ultimately result in a complete restriction, as opposed to a potential narrowing, of job opportunities in her profession. Cf. Spence v. Educ. Credit Mgmt. Corp. (In re Spence), 541 F.3d 538, 544 (4th Cir.2008). As previously discussed, given her background and experience, the Court concludes that Elisabeth could reasonably be expected to earn $60,000 a year.

David established that he has sought employment as a librarian, but that oppor-

tunities to obtain such a position are few and far between and that he has been unable to obtain one. Accordingly, the Court projects that David's income will continue to be approximately $30,000 per year.

### 3. Conclusion Regarding Additional Circumstances

As previously discussed, to satisfy the additional-circumstances prong of the *Brunner* test with respect to the entire amount of their student loan debt, the Plaintiffs must show that their circumstances "indicate a certainty of hopelessness" of repaying that debt, "not merely a present inability to fulfill [the] financial commitment." *Barrett,* 487 F.3d at 359 (internal quotation marks omitted). In the instant adversary proceeding, the Plaintiffs have not demonstrated a hopelessness meriting a total discharge of their student loan debt. To the contrary, the payments on the student loan debt owed to Key ($392.85 per month) are currently being made. Furthermore, the Court concludes that, if Elisabeth were to obtain employment in her fields of expertise, the Plaintiffs should be able to make additional payments to their student loan creditors without undue hardship.

The Court concludes that, based on the evidence presented at trial and the evidence of which the Court is taking judicial notice, the most reasonable method to determine the amount they should be expected to pay is the method employed by the IBR calculator. Plugging the $90,000 amount of the annual income projected by the Court into the IBR calculator (to which

---

**14.** If Elisabeth had presented evidence that she was unemployable in her fields of expertise, then the Court would have needed to decide whether the additional circumstance presented by such a scenario was beyond her control. *See Barrett,* 487 F.3d at 359. Of

course, the fact that her plagiarism was unintentional does not necessarily mean that the plagiarism was beyond her control. The Court, however, need not reach the issue given the lack of evidence that Elisabeth is unemployable in her fields of expertise.

the Plaintiffs stipulated the Court could take judicial notice), the Court concludes that additional circumstances suggest that the Plaintiffs should be able to pay $850 per month on their student loans.[15] Assuming the income projections set forth above, the Plaintiffs should be able to make this monthly payment if they keep their expenses at the levels set forth in their current budget.

Payments of $850 per month aggregate $10,200 per year. The period of time over which the Plaintiffs would be required to pay under the IBR is 25 years. The Plaintiffs, however, would be approximately 69 years old in 25 years, so a 25-year repayment period is not reasonable under the circumstances. It is reasonable to expect the Plaintiffs to make payments on their student loans until Elisabeth reaches the age of 65, which will occur in 21 years. *See Mosko v. American Educ. Servs. (In re Mosko)*, 2005 WL 2413582, at \*10 (Bankr.M.D.N.C. Sep. 29, 2005) ("The [debtor, who was 38 years old] shall pay $100 per month to ECMC until ... reach[ing] the age of sixty-five, at which time the remaining balance of the student loan debt shall be discharged in its entirety."). An annual payment of $10,200 over 21 years results in a total payment of $214,200.

In light of the foregoing, the Court concludes that additional circumstances exist indicating that the Plaintiffs should be able to pay $214,200 of their student loan debts. As explained in more detail below, this amount includes principal and interest.

## D. Prong Three: Good–Faith Efforts to Repay

In analyzing whether a debtor has made good faith efforts to repay, "the court should examine [1] the debtor's previous efforts to repay ... including the debtor's financial situation over the course of time when payments were due; [2] the debtor's voluntary undertaking of additional financial burdens despite his knowledge of his outstanding [student loan] debt; and [3] the percentage of the debtor's total indebtedness represented by student loans." *Rice v. United States (In re Rice)*, 78 F.3d 1144, 1150 (6th Cir.1996).[16] As explained below, the *Rice* factors demonstrate that the Plaintiffs have satisfied the good-faith prong.

### 1. The Plaintiffs' Previous Efforts to Repay Their Student Loans

As noted above, Elisabeth's loan with Key is currently is being made and has never been in default. Her loan with ECMC was paid through November 2007, when Elisabeth requested and received deferments that ended upon the filing of the adversary proceeding. At that point in time, the account was frozen and Elisabeth was advised that she need not make the payment pending the disposition of the adversary proceeding. The fact that certain payments to ECMC and Key were made with the help of her parents does not evidence a lack of good faith on Elisabeth's part. *See Wynn v. Missouri Coordinating Bd. of Educ. (In re Wynn)*, 270 B.R. 799, 804 (Bankr.S.D.Ga.2001) (finding good faith where "Debtor testified that he sought and received some financial help

---

**15.** Use of the IBR calculator may not be appropriate in all cases. The Court finds that its use is appropriate in this case in light of ECMC's request that the Court take judicial notice of the IBR calculator and the lack of any objection thereto.

**16.** Although *Rice* addressed the discharge of Health Education Assistance Loans, the Sixth Circuit Court of Appeals has held that "[t]he factors noted in *Rice* are also relevant in evaluating discharge of ordinary student loans." *Hornsby,* 144 F.3d at 437 n. 7.

from relatives to pay on the loans."). To the contrary, it illustrates that she was attentive to the obligation and not merely ignoring it. As noted above, David regularly made payments on his ECMC loan until he was informed that the loan account was frozen and that he need not make payments pending the disposition of the adversary proceeding. "There is no evidence that the [Plaintiffs] did not act in good faith. This is not a case where the [Plaintiffs] seek[ ] discharge within a month of loans becoming due." *Cheesman v. Tenn. Student Assistance Corp. (In re Cheesman)*, 25 F.3d 356, 360 (6th Cir.1994) ("The Cheesmans made minimal payments on their loans several years after their loans became due and at least a year before filing for bankruptcy. Furthermore, the Cheesmans chose to work in worthwhile, albeit low-paying, professions. There is no indication that they were attempting to abuse the student loan system by having their loans forgiven before embarking on lucrative careers in the private sector.").

■ Attempts to obtain, and success in obtaining, deferments and forbearances, are highly relevant to the good-faith-efforts-to-pay analysis and can be evidence of good faith even when the debtor has declined to participate in a program such as the IBR:

In sum, we concur with the BAP's analysis of the third prong of the *Brunner* test:

The Debtor in this case has reasonable expenses, yet continues to accrue debt for medical care. He has made efforts to increase his income within his ability. He has cooperated in providing information to his student loan creditors on an annual basis to obtain deferments. . . . Utilization of the [Income Contingent Repayment Plan ("ICRP"), a repayment plan similar to the IBR] would likely result in a substantial increase in his student loan debts over the repayment period. The Debtor has amply demonstrated his good faith.

*Barrett,* 487 F.3d at 365–66 (quoting and affirming *Educ. Credit Mgmt. Corp. v. Barrett (In re Barrett),* 337 B.R. 896, 904 (6th Cir. BAP 2006)).

■ Moreover, the Sixth Circuit Court of Appeals has held that, although "probative of [an] intent to repay [the] loans," a debtor's decision to forgo participation in [a repayment plan], "is not a per se indication of a lack of good faith[.]" *Barrett,* 487 F.3d at 364 (internal quotation marks omitted). If the Plaintiffs were to enter the IBR and make payments over a period of 25 years, they would incur over the repayment period a total liability to ECMC (including accrued interest) that would substantially exceed the amount they would actually have repaid, potentially leaving them with a large tax liability for discharge-of-indebtedness income. *Cf. Marshall v. Student Loan Corp. (In re Marshall),* 430 B.R. 809, 815 (Bankr. S.D.Ohio 2010) ("At the end of the 25–year repayment period, if the debt is cancelled, there are tax consequences for the Debtor. The Debtor would be 81 years old at the end of the 25–year repayment period, and likely still on a fixed income. The tax consequences for someone in that position could be devastating. The existence of the IBR cannot obliterate the Code's policy of a fresh start." (citations and internal quotation marks omitted)). The Court, therefore, concludes that the Plaintiffs declining to participate in the IBR does not evidence bad faith.

The Plaintiffs, however, should continue to exercise the restraint they have shown the last several months before trial and should do so until their student loans are paid in accordance with the terms of this opinion. The failure to restrain them-

selves during times when they were not repaying certain of their student loans causes them to nearly cross the line into bad faith, especially when they are concerned about the condition of their home's windows, bathroom and driveway. The loans they were not repaying, however, either were in deferment status, or those loans were frozen, at which time they were advised that they need not make payments pending the outcome of the adversary proceeding. Accordingly, the Court concludes that, on balance, their attention to the student loans exhibits a good faith effort to repay. *See Great Lakes Higher Educ. Corp. v. Brown (In re Brown)*, 239 B.R. 204, 209 (S.D.Cal.1999) (finding good faith where the debtors "sought and received two forbearances with the expectation that they would pay off their loans").

### 2. Undertaking Additional Financial Burdens

David's loans entered repayment status in June 2005, and Elisabeth's entered repayment status in March 2007. Elisabeth's own medical records reveal that she continued to incur credit-card debt after the loans entered repayment status, but the Court has insufficient details of the precise amounts and dates involved for the Court to draw any conclusions adverse to the Plaintiffs. The Plaintiffs also incurred significant debt on the Honda CRV in 2003 or 2004 and on their Honda Civic in December 2004 with awareness that their loans would be entering repayment status within one to three years. One could hardly say that the incurrence of debt to purchase vehicles was unnecessary or frivolous. The Plaintiffs undertaking additional financial burdens does not weigh in favor of a finding of good faith. On balance, however, these facts do not persuade the Court that the Plaintiffs failed to make good faith efforts to repay their student loans.

### 3. Percentage of Total Indebtedness Represented by the Student Loans

In assessing the third factor set forth in *Rice*—the percentage of the debtor's total indebtedness represented by the student loans—the Court must examine whether the amount of the student loan debt compared to the amount of the debtor's total indebtedness would suggest that the discharge of the student loan debt was the motivating factor in the debtor's filing for bankruptcy. *See Rice*, 78 F.3d at 1151. In *Rice*, the debtor's "student loans comprised 78 percent of his total indebtedness" and, when combined with the student loan debt of the debtor's spouse (which debt was not at issue), "96 percent of the debts to be discharged on their joint petition were student loans." *Id.* at 1147 & n. 2. The Sixth Circuit Court of Appeals found that the student loans "comprised the bulk of Rice's indebtedness" and that this "strongly suggests that their discharge was the motivating factor behind the bankruptcy petition." *Id.* at 1151. One court has stated that "[i]f under eighty percent (80%) of the debtor's debts were educational debts, then it is likely that the debtor has encountered financial difficulty after school, and that the bankruptcy is a result of a true need for bankruptcy relief rather than an abuse of the bankruptcy system." *Wegfehrt v. Ohio Student Loan Comm'n (In re Wegfehrt)*, 10 B.R. 826, 829 (Bankr.N.D.Ohio 1981) (quoting H.R.Rep. No. 95–595, at 1978 U.S. Code Cong. & Admin.News pp. 5963, 6094 (1977)).

There is, however, no bright-line percentage set forth in the statute or in the case law for determining whether discharge of student loan debt should be deemed to be the motivating factor for a bankruptcy, and the Court will not attempt to establish any such bright line in this

opinion. In the instant case, the total debt listed on the Plaintiffs' bankruptcy schedules is $558,080.70. Of this amount, their total student loan debt listed on the schedules is approximately $272,000. Thus, their student loans comprise approximately 48 percent of their total indebtedness. Such a percentage of student loan debt does not lead the Court to find that the motivating factor in the Plaintiffs' filing for bankruptcy was the discharge of their student loan debt. It is notable that the Plaintiffs' non-student loan debt (primarily credit-card debt and mortgage debt) is substantial. *See Bray v. Educ. Credit Mgmt. Corp. (In re Bray)*, 332 B.R. 186, 198 (Bankr.W.D.Mo.2005) (noting that "[w]hile a substantial percentage of the indebtedness listed on Schedule F which the Debtor seeks to discharge is related to his several student loans, substantial medical and credit card debts are also listed").

### 4. Conclusion Regarding Good–Faith Efforts to Repay

In light of the foregoing, the Court concludes that the Plaintiffs have satisfied the third prong of the *Brunner* test by a preponderance of the evidence.

### E. Partial Discharges of Student Loan Debt

The Sixth Circuit Court of Appeals has held that a court may grant a partial discharge of student loan debt. In order to receive such a discharge, a debtor must satisfy each prong of the *Brunner* test with respect to the portion of the debt to be discharged. *See Miller*, 377 F.3d at 624. As explained in detail above, the Plaintiffs have satisfied the minimal-standard-of-living and good-faith-efforts-to-repay prongs of the *Brunner* test. In addition, they have met the additional-circumstances prong with respect to any amounts due *or accruing* on the

student loans in excess of $214,200. The Court, therefore, concludes that a partial discharge is appropriate in the instant adversary proceeding. All amounts in excess of $214,200 (which includes both principal and interest) shall be discharged.

■ The Court also concludes that the total payment of $214,200 should be allocated among the Plaintiffs' various student loans pro rata. *See Nary v. Complete Source (In re Nary)*, 253 B.R. 752, 769–70 (N.D.Tex.2000) (affirming bankruptcy court's pro rata discharge of multiple student loan debts); *Raimondo v. New York State Higher Educ. Servs. Corp. (In re Raimondo)*, 183 B.R. 677, 681 (Bankr. W.D.N.Y.1995) (same). The information necessary to make the allocation, including the precise amount of debt owing to each lender, was not provided during the trial. Furthermore, in light of the disparate interest rates on the various loans, the Court requires the assistance of the parties to determine the proper allocation.

### IV. Conclusion

The Court will grant the Plaintiffs a partial discharge of their student loan debts. As explained in detail above, the Court concludes that the Plaintiffs have met, by a preponderance of the evidence: (1) the minimal-standard-of-living prong of the *Brunner* test; (2) the additional-circumstances prong of the *Brunner* test with respect to any amounts due or accruing on the student loans in excess of $214,200, allocated among their student loan debts; and (3) the good-faith-efforts-to-repay prong of the *Brunner* test.

By separate notice, the Court will set a hearing regarding the allocation issue. A separate final judgment will be entered in accordance with the foregoing after the

hearing to determine the allocation of the discharged amounts.